*Decisions will be entered under Rule 155.*

ARTHUR K. WHITCOMB AND LENA R. WHITCOMB, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ARTHUR WHITCOMB, INC., AND SUBSIDIARIES, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3360–79, 3361–79.    Filed September 21, 1983.

*Chester M. Howe*, for the petitioners.
*Charles W. Maurer, Jr.*, for the respondent.

RAUM, *Judge*: The Commissioner determined income tax deficiencies as follows:

|  | Year | Deficiency |
|---|---|---|
| Arthur Whitcomb, Inc., | 1974 | $2,624.00 |
| and Subsidiaries | 1975 | 18,242.00 |
| Arthur K. and Lena R. | 1974 | 2,877.52 |
| Whitcomb | 1975 | 17,115.55 |

After concessions, the only issues remaining for decision are whether Arthur Whitcomb, Inc., and Subsidiaries may take deductions for, and whether Arthur K. and Lena R. Whitcomb must include in income, premiums paid by Arthur Whitcomb, Inc., and Subsidiaries for 1974 and 1975 on a $1 million term

insurance policy on the life of Arthur K. Whitcomb, which policy was purportedly part of a plan of group–term life insurance.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference.

The individual petitioners, who are husband and wife, filed joint Federal income tax returns for 1974 and 1975. The parties have stipulated that at the time the petition herein was filed, the individual petitioners resided in Fort Lauderdale, Fla.[1] References hereinafter to "petitioner" in the singular will be to Arthur K. Whitcomb.

The corporate petitioners, who will be further identified hereinafter, are New Hampshire corporations with a principal office in Keene, N.H. These petitioners, which will sometimes be referred to collectively as the company, filed consolidated corporate income tax returns for 1974 and 1975 with the Andover, Mass., Service Center.

Petitioner began working in the sand and gravel business in 1931, and on January 1, 1946, he formed Arthur Whitcomb, Inc., naming himself president and treasurer. Arthur Whitcomb, Inc., is, in general, a management company, overseeing a number of corporations formed by petitioner in New Hampshire and Vermont. These corporations are engaged in producing and selling building supplies, sand, gravel, "Ready-Mix" concrete, and concrete building blocks, as well as renting heavy construction equipment, including bulldozers, graders, loaders, and trucks. Some of the corporations were subsidiaries of Arthur Whitcomb, Inc.; others were "affiliates." The names of the companies, such as Keene Sand & Gravel, Inc., Lebanon Crushed Stone, Inc., Charlestown Ready-Mix, Inc., Tilton Sand & Gravel, Inc., and Gorham Sand & Gravel, Inc., generally reflect the names of the principal towns in their respective areas of operation. During 1974, Keene Sand & Gravel, Lebanon Crushed Stone, and a company called Arthur Whit-

---

[1]However, par. 1 of their petition alleges that they "reside at 725 Main Street, Keene, New Hampshire," and respondent's answer admits that allegation.

comb Construction Co., Inc., were wholly owned subsidiaries of Arthur Whitcomb, Inc. During 1975, only the former two companies remained as subsidiaries, and they alone together with the parent corporation are the corporate petitioners (the company) herein.

In the years in question, the common stock of the company was held as follows:

| Stockholder | Shares | |
| --- | --- | --- |
| | 1974 | 1975 |
| Arthur K. Whitcomb | 311 | 311 |
| Lena R. Whitcomb | 83 | 83 |
| Robert A. Whitcomb (petitioners' son) | 111 | 111 |
| Barbara W. Bascetta (petitioners' daughter) | 111 | 111 |
| Petitioners' grandchildren | 14 | 14 |
| | 630 | 630 |

These same parties held, directly or indirectly, the stock of the other corporations listed above in roughly the same proportion as their holdings in the company.

Petitioner retired from the company on October 27, 1971, when he was 64 years of age. Since that date, he has been a member of the board of directors, but he has not received any amounts designated as salary for such services nor has he been formally employed by the company. However, he did receive a pension of $21,100 a year. He continued to work for the company at least to some extent in 1974 and 1975 during the approximately 6 months per year he then spent in New Hampshire, and he was still considered "the boss" even though his son Robert had been president of the company since petitioner's retirement in 1971. However, the record does not disclose to what extent petitioner's services during this period of about 6 months were rendered on behalf of the other corporations that were not subsidiaries of Arthur Whitcomb, Inc. The remainder of the year, petitioner resided in Florida, where he devoted his time to a sand and gravel business called Miramar Lakes, Inc., which he had begun there in 1971 or 1972.

Effective December 27, 1968, the company purchased an insurance policy from the Mutual Benefit Life Insurance Co. The policy provided group-term life insurance covering each active, full-time employee of the company and certain associated corporations. The policy provided coverage in an amount

equal to 100 times the projected monthly retirement benefit for which the person insured was eligible, plus the applicable amount determined according to the following schedule:

| Class | Employee classification | Amount |
|---|---|---|
| A | Officers; Division superintendents | $10,000 |
| B | Salesmen, foremen, office heads, all other superintendents who have not attained age 65 | 5,000 |
| C | Salesmen, foremen, office heads, and all other superintendents who have attained age 65 | 2,500 |
| D | All other persons insured who have not attained age 65 | 2,000 |
| E | All other persons insured who have attained age 65 | 1,000 |

It is stipulated that the amounts of insurance under this policy for the persons in class A were as follows at the specified times:

| | 4/7/69 | 2/5/71 | 12/17/71 | 1974 |
|---|---|---|---|---|
| Arthur K. Whitcomb | $10,000 | $10,000 | $5,000 | None |
| Robert A. Whitcomb | 21,500 | 69,500 | 69,500 | $96,000 |
| Thomas J. Bascetta | 21,500 | 62,000 | 62,000 | 96,000 |
| James C. Wirths | 10,000 | 10,000 | 10,000 | 81,500 |
| K. F. Briggs | 20,000 | 54,000 | 54,000 | None |
| R. I. Hastings | 21,500 | 61,000 | 61,000 | 65,000 |
| G. A. Mott | 10,000 | 10,000 | 10,000 | None |
| D. A. Price | 20,000 | 40,000 | 40,000 | 58,500 |
| G. C. Wright | 21,500 | 64,500 | 64,500 | 69,000 |

During 1973, the company purchased a separate $1 million "whole life" ("ordinary life") insurance policy on the life of petitioner. The company was the beneficiary of the policy, which had an annual premium of $69,500. The policy was purchased in order to ease anticipated liquidity problems in petitioner's estate, since it was estimated that upon his death there would be a Federal estate tax liability of $1 million. It was planned that the company would use the insurance proceeds to redeem stock from the estate, thereby providing the estate with funds to pay the estate tax liability. There is no contention that this policy was part of the group-term plan.

In 1974, the company decided to change the $1 million policy on petitioner's life from whole life insurance to term insurance. This was done because the annual premium for the term insurance was understood to be only $34,000 in 1974, and

because of the perceived tax benefits for the company if the premium were deductible. It was intended that the beneficiaries under the new policy would be petitioner's son and daughter, rather than the company, and that they would use the proceeds to purchase $1 million of the company's stock from their father's estate, which in turn would use the money to pay the Federal estate tax liability. Because the company would no longer be the beneficiary of the policy, it was anticipated that the premium would now be deductible.[2] Furthermore, it was thought that the amount of the premium would not be includable in petitioner's income because of section 79(b)(1), I.R.C. 1954.[3]

Accordingly, petitioner submitted an application dated October 18, 1974, for term insurance to the Provident Life and Accident Insurance Co. The application was for 1,000 "units," which presumably represented $1 million of insurance, and the named beneficiaries were petitioner's son and daughter. Attached to and made a part of the application were two completed medical examination forms, each signed by a different physician. The record indicates that petitioner was not assigned any "risk rating," but it does not establish that a "risk rating" would not have been assigned in the absence of satisfactory examination reports by the two physicians.

Thereafter, on November 1, 1974, the company's board of directors adopted a "Plan of Group Life Insurance for Eligible Employees." The coverage schedule set out in the plan was as follows:

| Class | Employee classification | Group term life insurance coverage |
|---|---|---|
| A | Active full-time employees with less than 1 year of service | $2,000 |
| B | Active full-time employees with 1 year but less than 2 years of service employed as a supervisor | $5,000 |

---

[2] See sec. 264 of the Code, note 6 *infra*, which denies any deduction for premiums paid where the taxpayer is directly or indirectly a beneficiary under the policy.

[3] See note 7 *infra*.

C   Active full-time employees
    with more than 3 years
    of service ........................... Two times his basic annual
                                        compensation with such
                                        compensation determined as of
                                        Jan. 1st each year, but in no
                                        event less than the amount
                                        of insurance on his life
                                        on _____.
D   Active full-time president,
    or retired president with at
    least 25 years of service with
    the company ...................... $1,000,000
E   Employees hired after this
    date shall become eligible to
    participate in this plan on
    the first day of the month
    coincident with or next
    following completion of
    six (6) months of service.

At the date of the meeting, petitioner was the only person qualified under class D of the plan. Other employees of the company had 25 years of service, but the president, Robert A. Whitcomb, was then about 37 years old and appears (from the schedule, p. 512 *infra*) to have been some 18 years short of qualification at that time.

The Provident Life & Accident Insurance Co. issued a $1 million group-term insurance policy on petitioner's life effective November 1, 1974. On November 19, 1974, petitioner executed an assignment of all of his interest in the policy to his son and daughter as tenants in common.

In respect of the benefits provided under the plan for the company's employees, the Mutual Benefit policy purchased in 1968 was replaced in 1975 with a policy from the Paul Revere Life Insurance Co. The amounts of insurance in 1975 for those in class 1 of the Paul Revere policy (which was comparable to class A of the Mutual Benefit policy) were as follows:

| | |
|---|---:|
| Arthur K. Whitcomb | 0 |
| Robert A. Whitcomb | $79,500 |
| Thomas J. Bascetta | 70,000 |
| James C. Wirths | 64,500 |
| R. I. Hastings | 70,500 |
| D. A. Price | 49,000 |
| G. C. Wright | 69,000 |
| T. Perry | 50,500 |

The 1974 premium for the Mutual Benefit policy was $31,695, and the 1975 premium for the Paul Revere policy was $29,307.

The premium paid by the company for the Provident Life & Accident Insurance Co. $1 million term policy on petitioner's life was $6,291.50 for 1974 and $38,004.90[4] for 1975. No other employee of the company appears to have been covered by a Provident Life & Accident Insurance Co. policy.

The $1 million term insurance policy on petitioner's life was canceled in November 1980. This was done because petitioner's estate planning had increased the liquidity of his assets, which apparently alleviated some concerns about the ability of his estate to pay the estimated Federal estate tax liability. The policy termination was also in part a response to the Internal Revenue Service's challenge of the company's claimed deductions for the premiums.

The record discloses the following salaries paid since 1960 to petitioner as president of the company until his retirement in 1971 and to his son Robert for years prior to succeeding his father as president as well as thereafter:

| Year | Petitioner | Robert |
|------|-----------|--------|
| 1960 | $30,000 | |
| 1961 | 35,000 | |
| 1962 | 35,000 | |
| 1963 | 35,000 | |
| 1964 | 35,000 | |
| 1965 | 35,000 | |
| 1966 | 45,000 | |
| 1967 | 45,000 | |
| 1968 | 50,000 | $14,450 |
| 1969 | 50,000 | 13,050 |
| 1970 | 50,000 | 18,325 |
| 1971 | 50,000 | 20,950 |
| 1972 | | 25,250 |
| 1973 | | 29,450 |
| 1974 | | 43,735 |
| 1975 | | 47,841 |
| 1976 | | 58,979 |
| 1977 | | 71,145 |
| 1978 | | 82,220 |
| 1979 | | 91,330 |
| 1980 | | 105,770 |

---

[4]The record does not explain the possible discrepancy between the anticipated $34,000 annual premium and the amounts thus actually paid.

The record does not disclose the amount of compensation, if any, that petitioner may have received from any of the related corporations organized by him which were not subsidiaries of Arthur Whitcomb, Inc. Petitioner's pension from the company since his retirement in 1971 has been and continues to be $21,100 per year for the remainder of his life.

In the statutory notice of deficiency issued to the company, the Commissioner increased the taxable income of the following corporations in the specified amounts as a result of his determination that deductions claimed as insurance premiums on petitioner's life did not constitute ordinary and necessary business expenses under section 162, I.R.C. 1954:

|  | 1974 | 1975 |
|---|---|---|
| Arthur Whitcomb, Inc | $3,328 | $19,672 |
| Lebanon Crushed Stone, Inc | 1,754 | 10,808 |
| Keene Sand and Gravel, Inc | 1,210 | 7,525 |
|  | 6,292 | 38,005 |

In the statutory notice sent to the individual petitioners, the Commissioner included in their income the amounts of $6,291.50 and $38,004.90 for 1974 and 1975, respectively, under section 61, I.R.C. 1954, based on his determination that the premiums paid by the company "do not meet the requirements of Section 79 of the 1954 Internal Revenue Code and consequently are not excludable from taxable income."

## OPINION

1. *Deductibility of the premiums paid by the company.*—The primary contention advanced in support of the company's claimed deduction of the term insurance premiums on petitioner's life is that they represented reasonable compensation under section 162(a)(1), I.R.C. 1954,[5] to petitioner for under-

---

[5]SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

See also sec. 1.162-7, Income Tax Regs.

compensated services rendered prior to his retirement or uncompensated services rendered in 1974 and 1975 or some combination of the two. We think that this contention must be rejected. The evidence presented leads inescapably to the conclusion that the decision to purchase the $1 million insurance policies on petitioner's life was made wholly apart from any considerations in respect of petitioner's services to the company; to the contrary, we are convinced that the decision was governed solely by the desire to use these companies controlled by petitioner and his wife and wholly owned within his family to provide the cash which would be needed to pay the Federal estate tax upon his death. Nothing in the record convinces us that it was the intent of the board of directors in adopting the "Plan of Group Life Insurance for Eligible Employees" to compensate petitioner for his services. Petitioner was not then an employee of the company, having retired in 1971 on an annual pension of $21,100, and there is no evidence that the board viewed his compensation prior to retirement as insufficient. Similarly, the minutes of the board's meeting make no reference to the services provided by petitioner after his retirement, and without some evidentiary support, we are unwilling to attribute to the board an intent which is contrary to other evidence presented by petitioner. Thus, James Wirths, the company's comptroller, stated unequivocally that the genesis of both the whole life and term policies on petitioner's life was the anticipated need of petitioner's estate for liquid assets, and Mr. Wirths gave no indication that this may have been simply the form chosen to pay to petitioner compensation which was independently determined to be his due. Compare *N. W. D. Investment Co. v. Commissioner*, 44 T.C.M. 1246, 1250-1251, 51 P-H Memo T.C. par. 82,564 (1982). Moreover, the decision to terminate the term policy in 1980 was made because petitioner no longer needed to provide cash for his estate and because of the potential loss of the company's deduction for the annual premium, rather than any considerations in respect of petitioner's past or present services. Since it is "settled law that only if payment is made with the intent to compensate is it deductible as compensation," *Paula Construction Co. v. Com-*

*missioner*, 58 T.C. 1055, 1058 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973), the company is not entitled to deduct these premiums under section 162(a)(1).

The company argues further that the premiums should be deductible as ordinary and necessary business expenses because the insurance served a purpose of the business in funding "the reasonable Section 303 needs of the business." This reference to section 303, I.R.C. 1954, which is entitled "Distributions in Redemption of Stock to Pay Death Taxes," is apparently derived from section 1.537-1(a), Income Tax Regs., which includes "the section 303 redemption needs of the business" within the definition of "reasonable needs of the business" for purposes of the accumulated earnings tax. For several reasons, this contention is without merit. First, the proceeds of the term policy, which were to be used to purchase stock from petitioner's estate, were to go to petitioner's son and daughter and not to the company. Therefore, there was no plan for a stock *redemption*, and any reference to section 303 is inapposite. Second, aside from the incongruity of comparing the provisions in respect of the accumulated earnings tax with section 162, section 537(b)(1) makes clear that the term "section 303 redemption needs" has meaning in respect of only the year in which the shareholder dies or years thereafter, which is not the case here. Finally, to the extent that the company might be said to derive some benefit from the insurance by ensuring that petitioner's estate would not have to sell stock to an outsider, the deduction would appear to be precluded by section 264(a)(1), I.R.C. 1954.[6] We hold that the company may not deduct the premiums paid in 1974 and 1975 on the term insurance policies on petitioner's life.

---

[6]SEC. 264. CERTAIN AMOUNTS PAID IN CONNECTION WITH INSURANCE CONTRACTS.

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.

See also sec. 1.264–1(b), Income Tax Regs.; cf. *D'Angelo Associates, Inc. v. Commissioner*, 70 T.C. 121, 137 (1978).

2. *Includability of amount of the premiums in petitioner's gross income.*—The parties appear to agree that the includability of the premiums in gross income turns upon whether the term insurance on Arthur Whitcomb's life qualifies as "group-term life insurance" within section 79 of the 1954 Code.[7] Petitioners contend that it does so qualify, and that the premiums are fully tax exempt to petitioner by reason of subsection (b)(1). The Government does not contest the claimed exemption if petitioner's life insurance does qualify as "group-term life insurance," but it vigorously challenges such qualification.

Section 79 first appeared in the 1954 Code in 1964. It was added by section 204 of the Revenue Act of 1964, 78 Stat. 19, 36. Prior thereto, the regulations, without any specific statutory authority, excluded from gross income all premiums paid by an employer on group-term life insurance for employees.[8] The primary focus of the new provisions of section 79 was to "revoke" such administrative exclusion (cf. *Enright v. Commissioner*, 56 T.C. 1261, 1266–1269 (1971)). This was accomplished by section 79(a), which, at the same time, provided explicitly for an exemption to a limited extent. Petitioners' principal position is founded, not on section 79(a), but on 79(b)(1), and it is their contention that the provisions of (b)(1) entitle them to complete exemption.

Subsection (b)(1) is concerned with an individual who "has terminated his employment" with the employer and "either has reached * * * retirement age * * * or is disabled." There is no controversy between the parties that petitioner satisfies these conditions. Moreover, both parties assume that if the

---

[7] SEC. 79. GROUP-TERM LIFE INSURANCE PURCHASED FOR EMPLOYEES.

(a) GENERAL RULE.—There shall be included in the gross income of an employee for the taxable year an amount equal to the cost of group-term life insurance on his life provided for part or all of such year under a policy (or policies) carried directly or indirectly by his employer (or employers); but only to the extent that such cost exceeds the sum of—

(1) the cost of $50,000 of such insurance, and

(2) the amount (if any) paid by the employee toward the purchase of such insurance.

(b) EXCEPTIONS.—Subsection (a) shall not apply to—

(1) the cost of group-term life insurance on the life of an individual which is provided under a policy carried directly or indirectly by an employer after such individual has terminated his employment with such employer and either has reached the retirement age with respect to such employer or is disabled (within the meaning of section 72(m)(7)).

[8] See sec. 1.61–2(d)(2), prior to amendment by T.D. 6856, filed Oct. 19, 1965.

remaining conditions of (b)(1) are satisfied, the premiums in question would be fully exempt; but the Government argues that the remaining conditions have not been satisfied, since, in its view, the term insurance policy on petitioner's life does not qualify as "group-term life insurance." A literal reading of section 79(b)(1) makes it difficult to understand the underlying assumption of both parties that qualification vel non under section 79(b)(1) is determinative of a full exemption. Section 79(b)(1) is not an exemption provision at all. Subsection (b) is captioned "Exceptions," and it begins by stating that "Subsection (a) shall not apply to—," followed immediately by paragraph (1). Thus, if the life insurance involved does qualify as "group-term life insurance" and the other conditions of (b)(1) are met, it would seem to follow merely that the limited exemption in subsection (a) will not apply. Nowhere in (b)(1) is there any statement that compliance with all the conditions in (b)(1) will result in a full exemption. Yet, such seems to have been the plainly expressed assumption of both the House Ways and Means Committee and the Senate Finance Committee. See H. Rept. 749, 88th Cong., 1st Sess. 40 (1963), 1964–1 C.B. (Part 2) 164; S. Rept. 830, 88th Cong., 2d Sess. 46–47, 1964–1 C.B. (Part 2) 550–551.[9] In the circumstances, taking into account the agreement of both parties on this matter, as supported by the clearly articulated understanding of the relevant committees of both houses of Congress, which is in turn reflected in the regulations (see note 9 *supra*), we will proceed on the same basis, notwithstanding the plain structure of the statute which appears to grant no such full exemption. We accordingly proceed to consider whether the term insurance on petitioner's life qualifies as "group-term life insurance," so as to determine the applicability of section 79(b)(1). A careful examination of

---

[9]Moreover, this assumption is reflected in the language of the Treasury regulations under sec. 79. For example, sec. 1.79–1(a)(2), Income Tax Regs., states that sec. 79 requires in general that, except as provided in sec. 79(b) and the corresponding sec. 1.79–2 of the regulations, an amount equal to the cost of group-term life insurance in excess of the cost of $50,000 of such insurance and the employee's contribution must be *included* in the employee's gross income. Consistent with this approach, sec. 1.79–2 of the regulations bears the heading "Exceptions to the rule of inclusion."

All references to sec. 1.79–1 and sec. 1.79–2, Income Tax Regs., are to the regulations in effect in 1974 and 1975 and not to the amended regulations promulgated in 1979, which are applicable in general only in "employee taxable years beginning on or after January 1, 1977." See sec. 1.79–1(g), Income Tax Regs.

the materials before us satisfies us that the term insurance on petitioner's life is not "group-term life insurance" within section 79(b)(1), and that the exemption claimed by petitioners is therefore not available to them. We agree with the Government's position that the policy on petitioner's life was not part of a "plan of group insurance" as defined in section 1.79–1(b)(1)(iii), Income Tax Regs., and thus was not "group-term life insurance" for purposes of section 79. See sec. 1.79–1(b)(1)(i), Income Tax Regs.

Under section 1.79–1(b)(1)(iii)(c), the amounts of insurance provided under a "plan of group insurance" must be based upon a formula which "precludes individual selection of such amounts." The regulation continues: "Thus, for example, the amounts of insurance on the lives of those individuals eligible for insurance under the plan must be based on a factor such as salary, years of service, or position, or a combination of such factors." In *Towne v. Commissioner*, 78 T.C. 791 (1982), a plan was adopted which provided insurance for each employee equal to the employee's salary up to $25,000, and an additional $500,000 of insurance for the president. In holding that the formula which determined the amount of insurance was based upon a combination of factors (salary and position) which did *not* preclude individual selection, the Court stated (78 T.C. at 798):

The fact that cannot escape our attention is that the position of president was occupied by only one individual. By providing for excess insurance to the person in this position, M & T was *individually* selecting that one particular person receive an extra amount of insurance. Certainly, if the regulations are to have any meaning whatsoever in prescribing that a general formula must be used to preclude individual selection, each element in the formula must be stated so that it applies to more than one individual. Otherwise, as was done in this case, the amount of insurance protection could always be individually selected for a particular person by simply defining the position or salary factor so narrowly that one of the included factors applied to only one person.

Here, the plan combined all three factors enumerated in the regulation, but, just as in *Towne*, it did not preclude individual selection in respect of the grossly disproportionate $1 million coverage under class D. While it is true that theoretically more than one person could qualify for this benefit, the existing circumstances in 1974 make clear that the plan was in fact adopted with the intent of providing this coverage only to

petitioner. Petitioner's son, Robert A. Whitcomb, the president of the company in 1974, was then 37 years old and was some 18[10] years away from qualifying under class D.[11] Nor is there any indication that any of the employees who then had 25 years of service to the company had any prospect whatever of becoming president. Indeed, the evidence is overwhelming that the plan containing this coverage was adopted solely because of the particular estate planning needs of petitioner, and the $1 million term policy on his life was terminated in 1980 when it was no longer needed to provide liquid assets for his estate.

It would require a level of naivete which is not required of any trial court or finder of facts to conclude that class D was created with an intent to include anyone other than petitioner, notwithstanding that it was formally couched in general terms. Regardless of the theoretical possibility that class D could encompass two or more individuals, we find that the plan as in effect in the years at issue did not in fact preclude individual selection and was therefore not a "plan of group insurance" as defined in the regulations. Thus, the insurance provided to petitioner was not "group-term life insurance," and section 79 is inapplicable here.

The conclusion that we have just reached is reinforced by section 1.79–1(a)(3) of the regulations, which states that "if group-term life insurance * * * is not provided as compensation for personal services rendered as an employee" then neither the exclusion provision of section 79 nor the blanket exclusion in effect prior to the enactment of section 79 will apply to such insurance, "and the tax treatment shall be determined under section 61(a) and the regulations thereunder."

---

[10]Although there was unexplained testimony that he was 4 years away from qualification, other evidence in documentary form lists his compensation for all years beginning in 1968, and there is no convincing evidence that he was employed by the company prior to 1968. Taking 1968 as a starting point, therefore, he would have worked for the company not more than 7 out of the required 25 years by 1974.

[11]It seems clear that it was understood that Robert as the active president could not qualify in any event under class D for $1 million life insurance prior to 25 years of service with the company, since the record affirmatively shows that the amount of insurance allocated to him in 1975 was $79,500.

Since we have already concluded herein that the insurance in question was not provided to petitioner as compensation for services rendered either before or after his retirement, section 61(a) and the regulations thereunder must govern the treatment of this insurance in respect of petitioner. Section 61(a) includes within gross income "all income from whatever source derived," and section 1.61–2(d)(2)(ii)(*a*) makes clear that this applies to life insurance coverage the benefits of which are payable to petitioner's beneficiaries (here, his son and daughter). As discussed in *Enright v. Commissioner*, 56 T.C. at 1266–1269, the administrative exclusion in effect prior to 1964 was "revoked" by Congress' decision to enact specific provisions with respect to group-term life insurance in section 79, and if the insurance does not come within section 79, then the premiums must be included in gross income under section 61(a).

*Decisions will be entered for the respondent.*

