PAL INTERNATIONAL CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pal Int'l Corp. v. Commissioner
Docket No. 17366-88
United States Tax Court
T.C. Memo 1993-53; 1993 Tax Ct. Memo LEXIS 55; 65 T.C.M. (CCH) 1903; February 17, 1993, Filed *55 Decision will be entered for respondent for the taxable year 1984 and for petitioner for the taxable year 1986. For petitioner: James Benham. For respondent: S. Mark Barnes. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined a deficiency in petitioner's Federal income tax for 1984 of $ 56,939. Respondent also determined that petitioner was liable for the following additions to tax for its 1986 taxable year: Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
$ 1,575
50 percent of the
$ 7,874
interest due on
$ 31,496
All statutory references are to the Internal Revenue Code in effect for the years in issue. Respondent has conceded the additions to tax. The sole issue for decision is whether petitioner is entitled to deduct the value of corporate assets diverted by its president and 50-percent shareholder for personal use. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and the accompanying exhibits are incorporated herein by reference. Petitioner (also referred to as the corporation) is an Arizona corporation with its principal place of business in Phoenix, Arizona. It filed *56 its Federal income tax return for the calendar year 1984 on the accrual basis with the Internal Revenue Service Center, Ogden, Utah. At all relevant times, the issued and outstanding shares of petitioner were held by Frank and Lillian Sacks (Mr. and Mrs. Sacks), each owning 50 percent of such shares. As a director and president of petitioner, Mr. Sacks effectively controlled the business operations of the corporation through September of 1984. Mrs. Sacks, who was also a director, served as petitioner's secretary. [1]
Mr. and Mrs. Sacks were husband and wife throughout 1984. However, on or about September 7, 1984, Mrs. Sacks filed a Petition for Dissolution of Marriage in the Superior Court of the State of Arizona. During September 1984, Mr. Sacks diverted cash and property of petitioner in the amount of $ 124,722 for his personal use. Specifically, Mr. Sacks withdrew $ 58,145 from the corporate bank account, representing all *57 of petitioner's working capital at that time, incurred approximately $ 20,500 in personal charges on the corporate credit card, and transferred title to a motor home and two automobiles from the corporation to himself. Mr. Sacks also removed several other miscellaneous items from the corporation. The diversion of assets was not approved by petitioner's shareholders or its board of directors. On September 12, 1984, Mrs. Sacks filed a complaint in a shareholder derivative suit on behalf of herself and petitioner against Mr. Sacks, alleging, among other things, that Mr. Sacks breached his fiduciary duty to petitioner by diverting corporate assets and property for his personal use. The complaint, filed with the Superior Court of the State of Arizona, sought a constructive trust with respect to the diverted assets as well as a temporary restraining order to prevent Mr. Sacks from removing additional corporate assets or damaging the business of petitioner. On the same day, the court issued a Temporary Restraining Order restraining Mr. Sacks from diverting or removing any assets of petitioner, interfering with the business and operations of the corporation, or interfering with Mrs. *58 Sack's accessibility to the corporate business or its books and records. On September 20, 1984, Mr. and Mrs. Sacks entered into a Stipulation and Order Continuing Restraining Order which left the temporary restraining order in effect indefinitely, and, at the same time, enlarged it to give Mrs. Sacks the sole right to manage and operate the business of petitioner and to prevent Mr. Sacks from entering petitioner's business premises, contacting its employees, drawing corporate funds from any of the corporate bank accounts, or otherwise interfering with the corporation's banking relations. The shareholder derivative suit and the petition for divorce were consolidated at the request of Mrs. Sacks' attorney. On May 7, 1986, a Decree of Dissolution was rendered in the divorce case. Included within the decree was a property settlement which awarded Mrs. Sacks, among other property, 100 percent ownership of petitioner. On its 1984 Form 1120, U.S. Corporation Income Tax Return, petitioner claimed a $ 124,722 theft loss deduction in respect of the corporate assets diverted from the corporation by Mr. Sacks. It also claimed deductions for compensation paid Mr. and Mrs. Sacks of $ 12,450 *59 and $ 10,000, respectively. The latter amounts were reflected on Forms W-2 issued by petitioner to Mr. and Mrs. Sacks for 1984. Mr. and Mrs. Sacks filed their 1984 tax returns as married persons filing separately. The Form W-2 that Mr. Sacks attached to his return reported $ 92,450 in compensation from petitioner and $ 21,076 in Federal withholding. [2] The $ 21,076 was not actually withheld by petitioner, nor was it paid by Mr. Sacks to the Internal Revenue Service. OPINION The sole issue for decision is whether *60 petitioner is entitled to deduct the value of corporate assets diverted by Mr. Sacks for personal use. [3]
We deal first with petitioner's claims that: (1) In a 1987 audit of petitioner and Mrs. Sacks, respondent's agent purportedly determined that such assets were compensation to Mr. Sacks; (2) on the basis of such determination, Mrs. Sacks agreed to a deficiency in her 1984 taxes, so as to reflect the tax liability in respect of her one-half community share of such compensation; and (3) as a result, respondent is estopped from asserting herein that the diverted assets were not compensation. We disagree. In the first place, petitioner has presented no evidence to support the factual allegations in its petition although it has the burden of proof in respect of its claims. Hofstetter v. Commissioner, 98 T.C. 695, 701 (1992). In this connection, we note *61 that while some of the allegations in the petition appear to have been admitted in respondent's answer, the facts admitted are not sufficient to satisfy petitioner's burden of proof. In any event, it is clear that reliance on a determination by one of the Commissioner's agents, during the course of an audit, is not sufficient to bind the Commissioner. See, e.g., Botany Worsted Mills v. United States, 278 U.S. 282, 288-289 (1929); Cleveland Trust Co. v. United States, 421 F.2d 475, 481-483 (6th Cir. 1970); Hofstetter v. Commissioner, supra at 699-700; Boulez v. Commissioner, 76 T.C. 209, 214 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987). Petitioner's main contention is that the diversion of corporate assets resulted in a deductible expense for 1984 either as compensation to Mr. Sacks or as a theft loss. Petitioner further contends that such diversion could not have been a constructive dividend, as asserted by respondent, because Mr. Sacks was powerless unilaterally to declare a dividend and because the proper corporate formalities *62 for declaring a dividend were not observed. Alternatively, petitioner contends that the diversion of assets constitutes a redemption under section 302. Respondent contends that the diversion of corporate assets by Mr. Sacks, petitioner's president, general manager, and controlling shareholder, constituted a constructive dividend, as opposed to compensation or a theft loss, and is therefore not deductible by the corporation. In this regard, respondent contends that: (1) Such assets were not received for "personal services actually rendered" as required by section 162(a)(1); and (2) petitioner has failed to establish the requisite criminal intent on the part of Mr. Sacks to commit a theft. It is well established that the diversion of assets by Mr. Sacks can constitute compensation "'only if [such] payment is made with the intent to compensate'". King's Court Mobile Home Park v. Commissioner, 98 T.C. 511, 514 (1992) (quoting Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1058 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973)); see Whitcomb v. Commissioner, 733 F.2d 191, 193 (1st Cir. 1984), *63 affg. 81 T.C. 505 (1983). The presence of an intent to compensate is a question of fact, Paula Construction Co. v. Commissioner, supra at 1058-1059, and petitioner has the burden of proof, Rule 142(a), Tax Court Rules of Practice and Procedure.
The main evidence that the diverted assets were intended as compensation is a copy of the Form W-2 submitted by Mr. Sacks with his 1984 tax return (Mr. Sacks' W-2 form). That document is different from the Form W-2 which petitioner filed with respondent. Mr. Sacks' W-2 form reflects wages of $ 92,450 and Federal withholding of $ 21,076, an excess of $ 80,000 over the $ 12,450 otherwise paid Mr. Sacks as compensation in 1984. On the record before us, there is no indication that Mr. Sacks' W-2 form was prepared simultaneously with the diversion of assets. Rather, the most likely explanation is that it was prepared at or about the time Mr. Sacks' 1984 return was filed. That would have been some time in 1985, after the filing of his wife's complaint accusing Mr. Sacks of diverting corporate assets. Moreover, the amounts so reported on his 1984 return would be includable in his *64 gross income whether characterized as constructive dividends or as wages. For that reason, Mr. Sacks' 1984 return has minimal, if any, evidentiary value regarding whether the corporation had the requisite compensatory intent at the time the diversion occurred in September of 1984. It may well be that Mr. Sacks reflected a portion of the diverted assets as compensation on his Form W-2 simply to counteract potential allegations of theft and/or misappropriation of petitioner's assets. The same is true of testimony in the record that, at the time Mr. Sacks withdrew the $ 58,145 from the corporate bank account, he told petitioner's bookkeeper to write checks for the Federal taxes in respect of such amount. Furthermore, the additional Federal withholding reflected on Mr. Sacks' W-2 form was never paid to the Internal Revenue Service, either by Mr. Sacks or petitioner. Indeed, at the time such assets were diverted, petitioner had insufficient funds to pay such withholding. In any event, such unilateral declaration by Mr. Sacks is not sufficient to enable us to characterize the diverted assets as compensation. The fact that, in earlier years, petitioner reported on Forms W-2 that Mr. *65 Sacks was paid larger sums as compensation than the $ 12,450 paid to him in 1984 does not provide sufficient support for such unilateral declaration of purported intent. [4]
Petitioner's claim of compensation is further weakened by additional evidence that neither Mrs. Sacks nor petitioner ever believed or intended that the diverted assets were to be compensation to Mr. Sacks. In this regard, Mrs. Sacks filed a shareholder derivative suit to recover the diverted assets and to prevent Mr. Sacks from taking additional assets, and petitioner claimed a theft loss deduction in respect of such diverted assets on its 1984 return. At trial, petitioner's operations manager at the time Mr. Sacks diverted the assets testified: "There was no way we could have treated it as compensation * * * and the fact of the matter *66 was that he took it and without authorization, in my view, and the only option we could come up with was a theft." Finally, the fact that the diversion occurred within several days of Mrs. Sack's decision to file for divorce belies petitioner's claim that such diversion was meant to compensate Mr. Sacks. It seems more likely that Mr. Sacks sought to remove as much property and cash from the corporation as possible so as to retain what he believed to be his share and/or to lessen the share Mrs. Sacks might receive in a property settlement. [5] Moreover, we note that, according to the testimony of petitioner's operating manager, "petitioner couldn't afford to issue a dividend at that time. The money wasn't available. It would have, you know, taken all the operating cash." Under such circumstances, it would have been highly unusual to compensate Mr. Sacks in anything like the amount of the diverted assets. *67 The long and short of the matter is that petitioner has failed to carry its burden of proof that the diversion of its assets by Mr. Sacks was deductible as compensation paid to him. In order to claim a theft loss, it is incumbent upon petitioner to establish, among other things, that: (1) A theft occurred under applicable State law, Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), affg. 61 T.C. 354 (1973); Citron v. Commissioner, 97 T.C. 200, 207 (1991); and (2) there is no reasonable prospect for reimbursement or recovery with respect to such theft. Citron v. Commissioner, supra; sec. 1.165-1(d)(3), Income Tax Regs. Petitioner has failed to carry its burden of proof in both respects. Section 13-1802 of the Arizona Revised Statutes Annotated (1989) defines "theft", in pertinent part, as follows: A. A person commits theft if, without lawful authority, such person knowingly: 1. Controls property of another with the intent to deprive him of such property; * * *
With respect to the element of criminal intent, petitioner has failed to show *68 that Mr. Sacks, at the time the assets were taken, intended to commit a theft of corporate assets. To the contrary, as petitioner states in its trial memorandum: "Frank Sacks, in an apparent effort to unilaterally divide the marital community, without prior notice, took assets out of the corporation * * * Frank Sacks originally announced the taking of property was done for the sole purpose of taking his one-half of the Corporation assets out of the corporate form." (Emphasis added.) We also note that the Arizona authorities refused to file criminal charges against Mr. Sacks in respect of the diversion of assets. Moreover, even if petitioner had established the requisite criminal intent on Mr. Sack's part, it has not demonstrated that there was no reasonable prospect for recovery or reimbursement in respect of the diverted assets. Inasmuch as the shareholder derivative suit was still pending at the end of the 1984 taxable year and absent any further evidence, we are unable to conclude that a reasonable prospect of recovery or reimbursement did not exist. In this respect, petitioner, in its brief, states that: "Pal International may have had a right to repayment from Frank *69 Sacks in the future". Having determined that the diversion of petitioner's assets was not compensation and did not constitute a theft, respondent's disallowance of the deduction for the agreed amount of the diverted assets is sustained. It is not necessary for us to address the other issues raised by the parties; i.e., whether the diversion of petitioner's assets constituted a constructive dividend to Mr. Sacks or whether it constituted a redemption of his interest in petitioner. In neither event would petitioner be entitled to deduct the amount diverted by Mr. Sacks. For the foregoing reasons, Decision will be entered for respondent for the taxable year 1984 and for petitioner for the taxable year 1986. Footnotes
1. Mr. and Mrs. Sacks were the only members of petitioner's board of directors in 1984.↩
2. The $ 80,000 disparity ($ 92,450 - $ 12,450) between the Form W-2 issued by petitioner and that attached by Mr. Sacks to his return remains unexplained. An officer of petitioner testified that Mr. Sacks apparently completed his own Form W-2 and submitted the new form in place of that provided by petitioner. It appears that the $ 80,000 of alleged additional compensation represents approximately the sum of $ 58,145 taken from the corporate bank account and $ 21,076 that Mr. Sacks reported as withholding.↩
3. Petitioner makes no claim that any of the assets were used for corporate purposes and therefore, to that extent, are deductible.↩
4. The stipulated Forms W-2 show $ 349,240 for 1981, $ 47,505 for 1982, and $ 25,300 for 1983, and there is some indication that the 1981 amount was so excessive that it could not have been intended as compensation.↩
5. In this respect, petitioner states in its trial memorandum that "Frank Sacks originally announced the taking of this property was done for the sole purpose of taking his one-half of the corporate assets out of the corporate form."↩