T.C. Memo. 2001-270


UNITED STATES TAX COURT


EUGENE A. BECK, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 12215-99, 12216-99,    Filed October 9, 2001.
          12217-99.


Eugene A. Beck, pro se.

<u>Tracey A. Martinez</u>, for respondent.

_____

    [1]Cases of the following petitioners are consolidated
herewith:  Eugene A. Beck, docket No. 12216-99 and Beck's Village
West Liquors, Ltd., docket No. 12217-99.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    A.  Formation and Titling of Stock in Beck's Liquors . . . 6
    B.  Purchases of Condominiums . . . . . . . . . . . . . . 7
    C.  Officers . . . . . . . . . . . . . . . . . . . . . . . 8
    D.  Operation of the Business . . . . . . . . . . . . . . 8

II. Audit of Returns . . . . . . . . . . . . . . . . . . . . . . 14

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Issues 1, 2, & 3:  Whether Beck's Liquors Is Liable for the Fraud
        Penalty Under Section 6663(a) for Each of the Years at
        Issue, and Whether Mr. Beck Is Liable for the Fraud
        Penalty Under Section 6663(a) for Fraudulently
        Understating His Income on His 1991 Federal Income Tax
        Return and Under Section 6651(f) for Fraudulently
        Failing To File Federal Income Tax Returns for 1992 and
        1993. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.  Underpayment of Tax . . . . . . . . . . . . . . . . . . . . . . . 20
    A.  Gross Receipts of Beck's Liquors . . . . . . . . . . . 21
        1.  State Bank Deposits . . . . . . . . . . . . . . . 21
        2.  Cash Payments . . . . . . . . . . . . . . . . . . 22
            a.  Cash From Till . . . . . . . . . . . . . . . 22
            b.  Gambling Losses . . . . . . . . . . . . . . . 22
            c.  Insurance Payment . . . . . . . . . . . . . . 23
        3.  Nonincome Items . . . . . . . . . . . . . . . . . 25
    B.  Disallowed Expenses . . . . . . . . . . . . . . . . . 26
        1.  Payments in Lieu of Wages . . . . . . . . . . . . 28
        2.  Vehicle Expenses and Depreciation . . . . . . . . 28
        3.  Annual Meeting Expenses . . . . . . . . . . . . . 29
        4.  Travel Expenses and Entertainment Expenses . . 30
            a.  Las Vegas Expenses . . . . . . . . . . . . . 30
            b.  Other Meal and Entertainment Expenses . . 31
            c.  Cost of Tickets To Various Sporting Events
                . . . . . . . . . . . . . . . . . . . . . . . 32
        5.  Insurance, Condominium Fees, Utilities, and
            Property Taxes Paid for Residences of Mr. Beck,
            Michael, and/or Michelle . . . . . . . . . . . 33
        6.  Charges on the Corporate Visa Card for Mr. Beck's
            Personal Expenses . . . . . . . . . . . . . . . 34
        7.  Mrs. Beck's Memorials, Funeral, and Medical
            Expenses . . . . . . . . . . . . . . . . . . . . 34

C.  Conclusion . . . . . . . . . . . . . . . . . . .  35

II.  Intent To Evade Taxes . . . . . . . . . . . . . . .  35
     A.  Badges of Fraud . . . . . . . . . . . . . . . .  36
         1.  Failure To Report Income Over an Extended Period of
             Time . . . . . . . . . . . . . . . . . . .  37
         2.  Failure To File a Tax Return . . . . . . . . .  39
         3.  Concealment of Bank Accounts From Internal Revenue
             Agent, Failure To Furnish the Government With
             Access To His Records, and Failure To Cooperate
             With Tax Authorities . . . . . . . . . . . .  39
         4.  Failure To Keep Adequate Books and Records  . .  40
         5.  Dealing in Cash . . . . . . . . . . . . . . .  40
         6.  Taxpayer's Experience and Knowledge, Especially
             Knowledge of Tax Laws . . . . . . . . . . .  41
         7.  Taxpayer's Implausible Explanations of Conduct
             Given at Trial . . . . . . . . . . . . . . .  41
         8.  Participation in Illegal Activities or Concealment
             of an Illegal Activity . . . . . . . . . . .  41
     B.  Conclusion . . . . . . . . . . . . . . . . . .  42

Issue 4.  Whether Petitioner Mr. Beck Received Constructive
          Dividends From Beck's Liquors in 1992 and 1993 in the
          Respective Amounts of $151,448 and $117,641 . . . .  43

I.  Ownership of Stock of Beck's Liquors . . . . . . . . . .  43

II.  Constructive Dividends . . . . . . . . . . . . . . . . .  45
     A.  Diverted Corporate Income . . . . . . . . . . . . .  46
     B.  Remaining Expenses . . . . . . . . . . . . . . . . .  48

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  Respondent determined deficiencies and penalties in petitioners' Federal income taxes for 1991, 1992, and 1993 as follows:

Eugene A. Beck
docket Nos. 12215-99, 12216-99

| Year | Deficiency | Penalty Sec. 6663(a) |
|------|-----------|----------------------|
| 1991 | $28,517.92 | $21,388.44 |
| 1992 | 41,509.00 | 31,131.75 |
| 1993 | 30,649.00 | 22,986.75 |

Beck's Village West Liquors, Ltd.
docket No. 12217-99

| Year | Deficiency | Penalty Sec. 6663(a) |
|------|-----------|----------------------|
| 1991 | $44,274.16 | $32,127.00 |
| 1992 | 23,047.49 | 17,285.62 |
| 1993 | 37,064.66 | 26,407.50 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are as follows:[2]

1. Whether Beck's Village West Liquors, Ltd. (Beck's Liquors or the corporation) is liable for the fraud penalty under section 6663(a) for each of the years at issue. We hold that it

---

[2]Respondent determined that Beck's Liquors overstated its cost of goods sold in the respective amounts of $3,014 and $11,474 on its 1991 and 1993 Federal corporate income tax returns and understated its cost of goods sold in the amount of $39,004 on its 1992 Federal corporate income tax return. Petitioners do not contest those adjustments. Additionally, the notices of deficiency contain adjustments to Beck's Liquors deductions for charitable contributions and to Mr. Beck's taxable Social Security benefits. These are computational adjustments which will be affected by the outcome of the other issues to be decided, and we do not separately address them.

is not, and, therefore, the period for assessing a deficiency has expired.

2.   Whether Eugene A. Beck (Mr. Beck) is liable for the fraud penalty under section 6663(a) for fraudulently understating his income tax on his 1991 Federal income tax return.  We hold that he is not, and, therefore, the period for assessing a deficiency has expired.

3.   Whether Mr. Beck is liable for the penalty under section 6651(f) for fraudulently failing to file Federal income tax returns for 1992 and 1993.[3]  We hold that he is not.

4.   Whether Mr. Beck received constructive dividends from Beck's Liquors in 1992 and 1993 in the respective amounts of $151,448, and $117,641.[4]  We hold that he received constructive dividends in lesser amounts to be computed under Rule 155 in accordance with the Court's finding and conclusions.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are

---

[3]In the notice of deficiency issued to Mr. Beck for 1992 and 1993, respondent determined that Mr. Beck was liable for the penalty for fraud under sec. 6663(a).  In the answer, respondent conceded that Mr. Beck was not liable under sec. 6663(a), but alleged that Mr. Beck was liable under sec. 6651(f).

[4]In the notice of deficiency issued to Mr. Beck for 1992 and 1993, respondent determined that Mr. Beck failed to report interest income in the respective amounts of $35 and $26.  Mr. Beck did not challenge that determination in his petition, and it is not at issue in these cases.

incorporated herein by this reference.

I. Background

At the time the petitions in these cases were filed, Mr. Beck resided in Fargo, North Dakota, and Beck's Liquors had its principal place of business in Fargo, North Dakota. At the time of the trial in this case, Mr. Beck was 73 years old.

A. Formation and Titling of Stock in Beck's Liquors

In 1977, Mr. Beck and his then wife, Gretchen Beck (Mrs. Beck), started a liquor store business in Fargo, North Dakota, known as Village West Liquors.[5] Mr. Beck also had another liquor store/bar known as Vega Ltd. Because Mr. Beck owned Vega Ltd., the Becks treated Mrs. Beck as the owner of Village West Liquors.

For liability purposes, the Becks decided to incorporate the liquor store business. On January 14, 1981, the Becks incorporated Beck's Liquors. Mrs. Beck transferred the business of Village West Liquors with a net value of $30,000 to Beck's Liquors in exchange for 30,000 shares of the common stock of Beck's Liquors.

The Becks have two children, Michael and Michelle. Every year from 1983 to 1987, Mrs. Beck transferred title to 3,000 shares of the stock of Beck's Liquors to each of her children. By July 1987, Michael and Michelle each held title to 15,000 shares of the common stock of Beck's Liquors.

---

[5]Before Mr. Beck operated the liquor store, he was a farmer.

In 1988, Michelle and her husband were having marital difficulties. In order to avoid a claim by Michelle's husband to the shares of Beck's Liquors stock titled in Michelle's name, title to the shares was transferred to Michael for $1. The corporate minutes specify that the corporation would issue 30,000 new shares of stock to Michelle after Mr. and Mrs. Beck had died.

Although the stock of Beck's Liquors was originally titled in Mrs. Beck's name and then transferred to the children, the Becks did not intend for the children to have any control over the stock, the corporation, or the business until after their deaths. Michael and Michelle were never told that they held title to any shares of Beck's Liquors stock. The corporate minutes specify that Mr. and Mrs. Beck would operate the business during their lifetime.

B. Purchases of Condominiums

In 1987 or 1988, Beck's Liquors paid $60,000 in cash for a condominium. The condominium was titled in the name of the corporation, but Mr. and Mrs. Beck lived in the condominium. In 1988, Beck's Liquors also purchased a condominium for Michael. Michael paid the condominium fees and utilities, and Beck's Liquors paid the real estate taxes.

On June 16, 1991, Mr. and Mrs. Beck were in an automobile accident. Mrs. Beck was killed instantly.

C. Officers

During the years at issue, the following persons were officers of Beck's Liquors:

### 1991

| | |
|---|---|
| President | Gretchen Beck |
| Vice president | Michael Beck |
| Secretary | Michelle Beck |
| Treasurer | Eugene Beck |

### 1992

| | |
|---|---|
| President and Treasurer | Eugene Beck |
| Vice president | Michael Beck |
| Secretary | Michael Beck |

### 1993

| | |
|---|---|
| President | Michael Beck |
| Vice president | Michelle Beck |
| Secretary and Treasurer | Eugene Beck |

D. Operation of the Business

In the 1980s, Mr. Beck worked at the liquor store in the morning, an employee, Jim Grandbois (Mr. Grandbois) worked in the afternoon, and Mrs. Beck closed the store. Mrs. Beck cleaned houses during the day and worked in the liquor store at night.

From 1990 through the years at issue, Mr. Grandbois worked full time and managed the store. In addition to his wages, Beck's Liquors provided Mr. Grandbois with basic health insurance through Protective Life.

During the years at issue, employees of Beck's Liquors often cashed their paychecks at the store and occasionally used cash from the till to pay for some minor store expenses; most store

expenses were paid by check. The paychecks written on the corporate account were not included with the daily bank deposits. Paychecks were cashed from the till in the amounts of $14,118 in 1991, $18,002 in 1992, and $2,382 in 1993. Expenses were paid from cash taken from the till in the amounts of $138 in 1991, $3,632 in 1992, and $1,709 in 1993.

Each day, Mr. Grandbois removed all but $100 of the currency, along with checks, receipts, and other miscellaneous items from the two cash tills in the store. He placed everything he removed from the tills into a deposit bag. The next morning, he took the tapes out of the cash register and placed them in the deposit bags.

Each day, Mr. Beck picked up the deposit bag and took it to his home, where he would count the money and prepare a deposit slip. Because of the store's close proximity to the Canadian border, some of the cash was in Canadian currency. Mr. Beck kept a lock box in his home. Often, he had in excess of $50,000 in cash in the lock box. Mr. Beck used the cash to exchange the Canadian currency with U.S. currency at the exchange rate. The U.S. currency was then included in the deposit.

Mr. Beck traveled to Las Vegas, Nevada, to exchange the Canadian currency to U.S. currency and to gamble. In 1991, he went to Las Vegas four or five times. In later years the exchange rate was lower, and Mr. Beck went less often. Mr. Beck

usually took $10,000 to $15,000 in Canadian money to exchange on each trip and stayed in Las Vegas for 3 or 4 days. The banks in Fargo charged a fee of 5 to 7 percent above the exchange rate but the casinos charged at the exchange rate. Mr. Beck thought that a better exchange rate given by the casinos exceeded and justified the cost of the trips. Beck's Liquors paid for Mr. Beck's travel to Las Vegas and deducted the expenses on its Federal income tax returns. Mr. Beck played blackjack only and "did very well" during the years at issue. He won $1,400 in 1991, $8,300 in 1992, and $12,000 in 1993. He did not report any gambling winning on his or the corporation's Federal income tax returns for the years at issue. He did report $20,000 of gambling winnings on the corporation's 1994 return.

Beck's Liquors maintained corporate accounts at State Bank of Fargo, Norwest Bank, and Merrill Lynch. Mrs. Beck maintained a personal account at Gate City Bank. Mr. Beck did not maintained a personal checking account; he paid for his personal expenses in cash.

During the years at issue, Mr. Beck kept the books and records for Beck's Liquors and had the primary responsibility for operating the store. Beck's Liquors, however, did not maintain a formal record keeping system for income and expense items. Mr. Beck kept ledger sheets on the back of a deposit book. The ledger sheets and cash register tapes were destroyed in July 1993

when the roof leaked.

Every summer, the Becks spent one or two weeks in a cabin at a resort on Lake Melissa in Detroit Lakes, Minnesota. Michelle and her three children stayed a week, and Michael stayed a couple days. The corporate minute book reflects that the annual stockholders meeting was held at the lake, and Beck's Liquors paid the expenses incurred by the Becks for the vacation.

Up until the time of Mrs. Beck's death, Beck's Liquors paid her a wage and officer's compensation. At the time of her death, Mrs. Beck had between $50,000 and $60,000, of which $26,000 was in cash. Mrs. Beck also had $6,604 in an IRA, the beneficiaries of which were Michael and Michelle. Two checks for $3,302 distributed from the IRA and a $1,000 check from her burial insurance were deposited into Beck's Liquors checking account. Some friends sent checks totaling approximately $9,500 to Mr. Beck as memorials for Mrs. Beck. The checks were deposited into Beck's Liquors checking account, and Mr. Beck wrote checks to churches and charitable organizations in memory of Mrs. Beck. Some of Mrs. Beck's funeral expenses were paid from Beck's Liquors checking account.

The insurance company paid for the vehicle that was destroyed in the accident. The vehicle was owned by Beck's Liquors. A check for $6,535 was issued on July 31, 1991, and, on August 12, 1991, $6,535 was deposited into the corporation's

Merrill Lynch account. In addition to the payment for the loss of the car, the insurance company paid to Mr. Beck death benefits of $4,934 in 1991, $6,543 in 1992, and $5,328 in 1993.

Beck's Liquors never paid Mr. Beck a salary. During the years at issue, Mr. Beck received Social Security benefits but did not receive a salary or wages from any source. Mr. Beck received Social Security payments in 1991, 1992, and 1993 in the respective amounts of $2,436, $2,836, and $2,923. Beck's Liquors paid a share of the expenses related to an office in the condominium in which Mr. Beck resided and garage storage in two garages. Mr. Beck used the corporate VISA credit card to pay for his personal expenses in addition to corporate expenses. He charged meals and travel expenses that were deducted as entertainment expenses on the corporate returns.

Michael worked as a custodian for Blue Cross/Blue Shield and Red Lobster. He also worked in the liquor store on Friday nights. He stocked shelves, filled the cooler, dusted shelves, swept the floors, and occasionally took deposits to the Bank and picked up freight from the liquor companies. In 1992, Beck's Liquors paid $9,400 in cash for a Mercury Topaz for Michael. He drove the Topaz when he ran errands for the store. During the years at issue, Beck's Liquors did not pay Michael cash for the work he did in the store. In lieu of wages, Beck's Liquors paid the real estate taxes on the condominium in which Michael

resided, the insurance on the Topaz, and the premium on Michael's life insurance policy.

During the years at issue, Michelle received public assistance and resided in Minnesota. After Mrs. Beck died, Michelle frequently drove with her three young children to Fargo to help Mr. Beck. At the time, Michelle owned an old Ford Mustang that did not have air conditioning, and Mr. Beck drove a Buick Century, titled in the name of the corporation. In order to make Michelle's drive to Fargo more comfortable, Mr. Beck traded the Buick for the Mustang. Beck's Liquors, however, retained title to the Buick. Mr. Beck drove the Mustang during the summer of 1991 and then traded the Mustang for a new Oldsmobile. The Oldsmobile was titled in the name of Beck's Liquors. For the occasional work Michelle performed for the store, Beck's Liquors paid for the insurance on the Buick she drove.

In August 1992, Michelle purchased a house in Cottage Grove, Minnesota, for $80,000. The $1,000 downpayment was paid by a check drawn on Beck's Liquors checking account. The balance of the purchase price was paid with cash from a loan secured by certificates of deposit (CDs) owned by Beck's Liquors. Mr. Beck paid the balance of the loan with cash payments of $35,000 in 1992 and $44,000 in 1993.

In 1991, Beck's Liquors paid off a $5,000 loan with cash. In 1992, Mr. Beck purchased a diamond ring for $10,655 in cash.[6]

Mr. Beck prepared and filed corporate income tax returns for Beck's Liquors for tax years 1991, 1992, and 1993.  Mr. Beck prepared and filed his individual income tax return, Form 1040, for tax year 1991.  He did not file individual income tax returns, Forms 1040, for tax years 1992 and 1993.

## II. Audit of Returns

In 1993, the Internal Revenue Service (IRS) reviewed the records of businesses in the Fargo area to ensure that the businesses had properly reported cash transaction of $10,000 or more.  A review of the records of a car dealership revealed that Beck's Liquors purchased a car for approximately $9,000 in cash. On the basis of that cash transaction, the IRS conducted an audit of Beck's Liquors returns for 1991 and 1992.  Later, the agent included the return for 1993.

The IRS agent interviewed Mr. Beck.  Mr. Beck cooperated with the agent.  He gave the agent his checks, invoices, and cash register receipts, which were his only records.  He did not make misleading statements to, or give misleading documents to, respondent's agents.

Because Beck's Liquors had no formal books, the IRS agent

---

[6]Mr. Beck remarried in 1994 and gave the ring to his present wife.

reconstructed the corporation's income using canceled checks, bank statements, invoices, and cash register receipts. The agent identified all of the accounts of Beck's Liquors and the Becks. The agent analyzed the deposits made to the accounts and excluded all deposits that the agent believed were nontaxable, including transfers between accounts. The agent also obtained other documents, such as statements from casinos and forms reporting cash transactions. Statements from two casinos showed gambling losses of $20,600 in 1991 and $15,700 in 1992. The agent concluded that Beck's Liquors had income in 1991, 1992, and 1993 from Mr. Beck's use of the corporation's cash that was not deposited into any corporate account. He also concluded that Mr. Beck had income from the use of corporate funds to make the cash purchases and to pay funeral and memorial expenses of Mrs. Beck and personal living expenses of Mr. Beck and his children.

The agent referred the case to the Criminal Investigation Division. The case was assigned to a special agent and finally to the Department of Justice. The Department of Justice declined to prosecute Mr. Beck. In 1997, the case was returned to the original IRS agent for civil closing.

The agent met with Mr. Beck two or three times. The first time Mr. Beck saw the proposed adjustments was during one of these meetings. The agent prepared a report and the matter went to Appeals. On April 9, 1999, respondent mailed to Beck's

Liquors and to Mr. Beck notices of deficiency for the taxable years 1991, 1992, and 1993.

Using the bank deposits and cash expenditures method, respondent determined that Beck's Liquors underpaid its tax by $44,274.16 in 1991, $23,047.49 in 1992, and $37,064.66 in 1993.

Respondent asserts that Beck's Liquors underreported its income by the following amounts:

|  | 1991 | 1992 | 1993 |
|---|---|---|---|
| Unreported gross receipts | 74,453 | 115,133 | 84,782 |
| Cost of goods sold | 3,014 | (39,004) | 11,474 |
| Disallowed expenses | 46,060 | 26,476 | 30,204 |
| Total unreported income | 123,527 | 102,605 | 126,460 |

Respondent's adjustments to the gross receipts of Beck's Liquors were computed as follows:

|  | 1991 | 1992 | 1993 |
|---|---|---|---|
| State Bank deposits | 1,574,706 | 1,475,700 | 1,554,350 |
| Cash payments | 85,164 | 101,305 | 75,487 |
| Nonincome items | (404,324) | (335,616) | (391,143) |
| Total gross receipts | 1,255,546 | 1,241,389 | 1,238,694 |
| Reported on return | 1,181,093 | 1,126,256 | 1,153,912 |
| Unreported gross receipts | 74,453 | 115,133 | 84,782 |

The cash payments were identified as follows:

| Cash payments | 1991 | 1992 | 1993 |
|---|---|---|---|
| Cash expenses--till | 138 | 3,632 | 1,709 |
| Wage--till | 14,118 | 18,002 | 2,382 |
| Gambling losses | 20,600 | 15,700 | -- |
| Insurance proceeds | 6,535 | -- | -- |
| State Bank CD | 27,500 | -- | -- |
| Norwest Bank | 2,273 | 2,316 | 4,026 |
| Gate City S&L | 9,000 | -- | -- |
| Loan payments | 5,000 | 35,000 | 44,000 |

| | | | |
|---|---|---|---|
| Purchase of ring | -- | 10,655 | -- |
| Purchase of car | -- | 9,400 | -- |
| Merrill Lynch | -- | 6,600 | -- |
| Deposit subsequent year | -- | -- | 23,370 |
| Total cash payments | 85,164 | 101,305 | 75,487 |

The nonincome items did not include $6,604 from Mrs. Beck's IRA, a $1,000 check from her burial insurance, and gifts totaling approximately $9,500 from friends given to Mr. Beck in memorial to Mrs. Beck that were deposited into the corporation's accounts.

Respondent made adjustments to the deductions for expenses as follows:

|  | 1991 | | | 1992 | | | 1993 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Return | Exam | Adjust. | Return | Exam | Adjust. | Return | Exam | Adjust. |
| Wages | 26,658 | 16,220 | 10,438 | 31,394 | 32,649 | (1,255) | 33,567 | 33,078 | 489 |
| Repairs | 5,322 | 2,605 | 2,717 | 2,893 | 690 | 2,203 | 1,110 | 371 | 739 |
| Bad debts | 1,250 | -0- | 1,250 | 2,017 | -0- | 2,017 | 2,274 | -0- | 2,274 |
| Rents | 47,015 | 45,136 | 1,879 | 46,966 | 45,946 | 1,020 | 46,119 | 44,864 | 1,255 |
| Taxes | 3,594 | 1,361 | 2,233 | 3,031 | 1,190 | 1,841 | 5,701 | 20 | 5,681 |
| Interest | 1,079 | -0- | 1,079 | 567 | -0- | 567 | 748 | -0- | 748 |
| Depreciation | 5,390 | 1,340 | 4,050 | 6,890 | 1,340 | 5,550 | 7,466 | 1,186 | 6,280 |
| Payroll tax | 10,344 | 7,538 | 2,806 | 8,953 | 8,935 | 18 | 11,199 | 10,292 | 907 |
| Advertising | 10,647 | 9,016 | 1,631 | 9,327 | 6,432 | 2,895 | 9,582 | 6,120 | 3,462 |
| Cleaning | 3,279 | 1,198 | 2,081 | -0- | 145 | (145) | -0- | 295 | (295) |
| Entertmnt. 80% | 2,600 | 18 | 2,582 | 2,948 | 230 | 2,718 | 2,367 | -0- | 2,367 |
| Utilities | 10,733 | 9,635 | 1,098 | 10,657 | 9,259 | 1,398 | 11,588 | 10,008 | 1,580 |
| Security | 540 | 540 | -0- | 540 | 540 | -0- | 540 | 540 | -0- |
| Bus. expense | 2,091 | 267 | 1,824 | 2,140 | 1,075 | 1,065 | 2,204 | 404 | 1,800 |
| License | 2,730 | 1,400 | 1,330 | 1,850 | 700 | 1,150 | -0- | 2,130 | (2,130) |
| Supplies | 9,284 | 8,578 | 706 | 8,614 | 9,173 | (559) | 5,944 | 6,451 | (507) |
| Insurance | 6,197 | 740 | 5,457 | 3,657 | 740 | 2,917 | 3,105 | 745 | 2,360 |
| Legal | 497 | 497 | -0- | -0- | -0- | -0- | 200 | 200 | -0- |
| Job service | 105 | 84 | 21 | 256 | 256 | -0- | 258 | 258 | -0- |
| Dues & subs. | 972 | -0- | 972 | 1,102 | 75 | 1,027 | 1,044 | 810 | 234 |
| Auto. exp. | 4,409 | 1,200 | 3,209 | 3,913 | 1,200 | 2,713 | 4,234 | 1,200 | 3,034 |
| Bank charges | 1,550 | 2,293 | (743) | 3,330 | 5,427 | (2,097) | 3,596 | 5,909 | (2,313) |
| Workmen's comp. | 193 | 193 | -0- | 325 | 325 | -0- | 529 | 529 | -0- |
| Ann. mtg. exp. | 1,254 | -0- | 1,254 | 1,084 | -0- | 1,084 | 910 | -0- | 910 |
| State withng. | -0- | -0- | -0- | 349 | -0- | 349 | 396 | -0- | 396 |
| ND income tax | -- | 1,814 | (1,814) | 2,710 | 2,710 | -0- | 933 | -0- | 933 |
| Total | 157,733 | 111,673 | 46,060 | 155,513 | 129,037 | 26,476 | 155,614 | 125,410 | 30,204 |

Respondent determined that the following payments by Beck's Liquors were constructive dividends to Mr. Beck:

|                                   | 1991    | 1992    | 1993    |
|-----------------------------------|---------|---------|---------|
| Condo association fees            | 1,276   | 1,014   | 980     |
| Insurance-condos, vehicles        | 3,687   | 1,866   | 1,830   |
| Diverted corporate income         | 74,453  | 115,133 | 84,782  |
| Credit card--personal expenses    | 14,095  | 14,993  | 16,193  |
| Auto expense/repairs              | 10,152  | 7,294   | 4,679   |
| Miscellaneous                     | -0-     | 378     | 254     |
| Advertising/personal ticket use   | 200     | 200     | 200     |
| Condo utilities                   | 1,098   | 1,398   | 1,580   |
| Other personal expenses           | 15,237  | 5,239   | 2,221   |
| Property taxes                    | 1,780   | 1,750   | 3,296   |
| Annual meeting expenses           | 1,461   | 2,183   | 1,626   |
| Total                             | 123,439 | 151,448 | 117,641 |

As a result of respondent's determination that Mr. Beck received constructive dividends from Beck's Liquors in each of the years at issue, respondent determined that Mr. Beck underpaid his taxes in 1991, 1992, and 1993, respectively, in the amounts of $28,517.92, $41,509.00, and $30,649.00.

OPINION

Issues 1, 2, & 3:  Whether Beck's Liquors Is Liable for the Fraud Penalty Under Section 6663(a) for Each of the Years at Issue, and Whether Mr. Beck Is Liable for the Fraud Penalty Under Section 6663(a) for Fraudulently Understating His Income on His 1991 Federal Income Tax Return and Under Section 6651(f) for Fraudulently Failing To File Federal Income Tax Returns for 1992 and 1993.

Respondent asserts that Beck's Liquors is liable for the fraud penalty under section 6663(a) for each of the years at issue, and that Mr. Beck is liable for the fraud penalty under section 6663(a) for fraudulently understating his income on his

1991 Federal income tax return and under section 6651(f) for fraudulently failing to file Federal income tax returns for 1992 and 1993.

Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, 94 T.C. 654, 660 (1990). Respondent must prove by clear and convincing evidence (1) that petitioners underpaid their taxes in each year and (2) that petitioners intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection. Parks v. Commissioner, supra at 660-661.

## I. Underpayment of Tax

First, respondent must prove by clear and convincing evidence the existence of an underpayment of tax for each of the years at issue. For fraud purposes, respondent may not rely upon petitioners' failure to carry the burden of proof as to the underlying deficiency. Id.; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971).

Respondent asserts that, using the bank deposits and cash expenditures method, Beck's Liquors underpaid its tax by $44,274.16 in 1991, $23,047.49 in 1992, and $37,064.66 in 1993. Respondent asserts that Mr. Beck received constructive dividends from Beck's Liquors in each of the years at issue, and, as a result, Mr. Beck underpaid his taxes in 1991, 1992, and 1993,

respectively, in the amounts of $28,517.92, $41,509.00, and $30,649.00.

If a taxpayer does not maintain adequate books and records, the Commissioner may reconstruct the taxpayer's income by any reasonable method which clearly reflects income. Sec. 446(b); Holland v. United States, 348 U.S. 121, 130-132 (1954); Caulfield v. Commissioner, 33 F.3d 991, 992-993 (8th Cir. 1994), affg. T.C. Memo. 1993-423. The bank deposits and cash expenditures method is a rational way to reconstruct income. See Caulfield v. Commissioner, supra at 993; Parks v. Commissioner, supra at 658; Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

Respondent asserts that Beck's Liquors underreported its income by $123,527 for 1991, $102,605 for 1992, and $126,460 for 1993.

A. Gross Receipts of Beck's Liquors

Respondent determined unreported gross receipts of Beck's Liquors totaling $74,453 for 1991, $115,133 for 1992, and $84,782 for 1993.

1. State Bank Deposits

Petitioners do not dispute the amounts of the State Bank deposits. Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, supra at 656-657.

2. <u>Cash Payments</u>

Respondent included in the gross receipts of Beck's Liquors items identified as cash payments totaling $85,164 in 1991, $101,305 in 1992, and $75,487 in 1993. Petitioners dispute that these items were gross receipts of Beck's Liquors.

a. <u>Cash From Till</u>

Employees of Beck's Liquors often cashed their paychecks at the store and occasionally used cash from the till to pay for some minor store expenses; most store expenses were paid by check. The paychecks written on the corporate account were not included with the daily bank deposits. Because Mr. Beck used the deposits to calculate gross receipts, the cash used to cash the checks and pay the expenses was omitted from the computation of gross receipts. Paychecks were cashed from the till in the amounts of $14,118 in 1991, $18,002 in 1992, and $2,382 in 1993. Expenses were paid from cash taken from the till in the amounts of $138 in 1991, $3,632 in 1992, and $1,709 in 1993. Beck's Liquors underreported its gross receipts in those amounts in the years at issue.

b. <u>Gambling Losses</u>

On the basis of reports from two casinos, respondent asserts that Mr. Beck used corporate cash to pay for gambling losses in 1991 and 1992. Records from the Mirage casino indicate that Mr. Beck lost $1,000 in 1991. Records from the Riviera casino show

that Mr. Beck lost $19,600 in 1991 and $15,700 in 1992, and won $3,200 in 1993. Mr. Beck, however, did not have gambling losses during the years at issue. Rather, he had gambling winnings of $1,400 in 1991, $8,300 in 1992, and $12,000 in 1993. Mr. Beck did not report the gambling winnings on his individual returns or the corporation's returns for the years at issue. Because he gambled with the corporation's Canadian currency, Mr. Beck thought that the winnings were taxable to Beck's Liquors. Therefore, in an attempt to "correct" the omission, he reported $20,000 of gambling winnings on the corporation's 1994 return.

The winnings, however, are not the income of Beck's Liquors. Even though Mr. Beck used corporate funds for gambling, the winnings are Mr. Beck's income and represent his unreported income in the years at issue. In computing the income of Beck's Liquors, however, we find that the cash expenditures should not include gambling losses. Furthermore, the cash winnings represent a source of cash, and the cash expenditures should be reduced by $1,400 in 1991, $8,300 in 1992, and $12,000 in 1993.

### c. Insurance Payment

The insurance payment was for the vehicle that was destroyed in the accident in which Mrs. Beck was killed. The vehicle was owned by Beck's Liquors. Respondent included insurance proceeds of $6,604 in the gross receipts of Beck's Liquors because, respondent asserts, there was no business use and Mr. Beck cashed

the check and received the money. Contrary to respondent's assertion, however, the record shows that the insurance company issued a check for $6,535 on July 30, 1991 and $6,535 was deposited into the corporation's Merrill Lynch account on August 12, 1991. Mr. Beck did not receive the money. The insurance payment was for a casualty loss that occurred in the year of the payment. Respondent has not established that there was a gain on the receipt of the insurance payment (i.e., that the basis in the vehicle was less than the amount of the payment). We find that the payment is income neither to the corporation nor to Mr. Beck.

d. Remaining Cash Payments

Mr. Beck contends that the following cash payments were not income because they were made with cash Mrs. Beck had accumulated before her death:

|  | 1991 | 1992 | 1993 |
| --- | --- | --- | --- |
| Purchase of ring | -- | $10,655 | -- |
| Purchase of car | -- | 9,400 | -- |
| Loan payments | $5,000 | 35,000 | $44,000 |
| State Bank CD | 27,500 | -- | -- |
| Norwest Bank | -- | -- | 4,026 |
| Gate City S&L | 9,000 | -- | -- |
| Total | 41,500 | 55,055 | 48,026 |

At the time of her death, Mrs. Beck had between $50,000 and $60,000, of which only $26,000 was in cash. The cash expenditures for 1991 should be reduced to reflect the $26,000 available to Mr. Beck.

In addition to Mrs. Beck's cash, Mr. Beck received Social Security payments in 1991, 1992, and 1993 in the respective amounts of $2,436, $2,836, and $2,923. The corporation paid most of Mr. Beck's living expenses, meals, condominium fees, utilities, car expenses, and entertainment and travel expenses. Mr. Beck did not deposit his Social Security checks into any bank account. He kept the money in cash. Respondent has not established that the cash was not available for the cash payments.

We have also found that Mr. Beck's gambling winnings should be included in the cash available.

### 3. Nonincome Items

Mr. Beck asserts that the amount of nonincome items should be increased to reflect $6,604 from Mrs. Beck's IRA, a $1,000 check from her burial insurance, gifts from friends totaling approximately $9,500 given to Mr. Beck in memorial to Mrs. Beck, and death benefits paid to Mr. Beck.

Mrs. Beck had $6,604 in an IRA, the beneficiaries of which were Michael and Michelle. Two checks for $3,302 distributed from the IRA and a $1,000 check from her burial insurance were deposited into Beck's Liquors checking account. The nonincome items should be increased to reflect those nontaxable deposits.

Friends sent checks totaling approximately $9,500 to Mr. Beck as memorials for Mrs. Beck. The checks were deposited into

Beck's Liquors checking account. The nonincome items should be increased to reflect those nontaxable deposits.

The insurance company paid to Mr. Beck death benefits of $4,934 in 1991, $6,543 in 1992, and $5,328 in 1993. The insurance payments were deposited into the State Bank account. The payments are not income to Beck's Liquors, and the nonincome amount should be increased by those amounts.

B.  Disallowed Expenses

Respondent disallowed certain of Beck's Liquors' business expense deductions reported on the corporation's returns for 1991, 1992, and 1993 in the respective amounts of $46,060, $26,476, and $30,204.

Petitioner was unable to substantiate some of the expenses. Some of the expenses were personal living expenses that are not deductible pursuant to section 262. The primary items in dispute are (1) payments in lieu of wages, (2) vehicle expenses and depreciation, (3) annual meeting expenses, (4) travel and entertainment expenses, (5) insurance, condominium fees, utilities, and property taxes paid for residences of Mr. Beck, Michael, and/or Michelle, (6) charges on the corporate VISA card for Mr. Beck's personal expenses, (7) Mrs. Beck's funeral and medical expenses, and (8) payments made to churches and charitable organizations in memory of Mrs. Beck.

Section 162 generally allows a deduction for ordinary and necessary business expenses. In general, an expense is ordinary under section 162 if it is considered "normal, usual, or customary" in the context of the particular business out of which it arose. Deputy v. du Pont, 308 U.S. 488, 495 (1940). Ordinarily, an expense is necessary if it is appropriate and helpful to the taxpayer's trade or business. Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985). Even if an expense is ordinary and necessary, it is deductible under section 162 only to the extent it is reasonable in amount. See, e.g., United States v. Haskel Engg. & Supply Co., 380 F.2d 786, 788-789 (9th Cir. 1967).

In deciding whether an expense is ordinary and necessary within the meaning of section 162, courts generally focus on the existence of a reasonably proximate relationship between the expense and the taxpayer's business and the primary motive or purpose for incurring the expense. See, e.g., Greenspon v. Commissioner, 229 F.2d 947, 954-955 (8th Cir. 1956), affg. on this issue 23 T.C. 138 (1954); Henry v. Commissioner, 36 T.C. 879, 884 (1961); Larrabee v. Commissioner, 33 T.C. 838, 841-843 (1960). In general, where an expenditure is primarily for profit-motivated purposes, and personal benefit is distinctly secondary and incidental, it may be deducted under section 162.

Intl. Artists, Ltd. v. Commissioner, 55 T.C. 94, 104 (1970); Sanitary Farms Dairy, Inc. v. Commissioner, 25 T.C. 463, 467-468 (1955); Rodgers Dairy Co. v. Commissioner, 14 T.C. 66, 73 (1950). Conversely, if an expenditure is primarily motivated by personal considerations, no deduction for it will be allowed. Henry v. Commissioner, supra; Larrabee v. Commissioner, supra.

1.  Payments in Lieu of Wages

In lieu of wages, Beck's Liquors paid the real estate taxes on the condominium in which Michael resided, the insurance on the Topaz, and the premium on Michael's life insurance policy. For the occasional work Michelle performed for the store, Beck's Liquors paid for the insurance on the Buick she drove. Those payments are for services rendered and are deductible by the corporation.

2.  Vehicle Expenses and Depreciation

Section 167 generally allows a depreciation deduction with respect to property used in a trade or business or held for the production of income. In determining whether such a deduction is permitted, courts ordinarily have focused on whether the acquisition and/or maintenance of property was primarily associated with profit-motivated purposes. Intl. Artists, Ltd. v. Commissioner, supra.

On the 1991, 1992, and 1993 corporate returns, Beck's Liquors claimed vehicle expenses for three vehicles: The pickup

truck, the car driven by Mr. Beck, and the car driven by Michael. Respondent allowed a vehicle expense deduction for 100 percent of the use of the pickup truck, plus $100 per month for other expense relating to vehicle use.

A taxpayer's costs of commuting to and from his place of business are nondeductible, personal expenses. Fausner v. Commissioner, 413 U.S. 838 (1973); Commissioner v. Flowers, 326 U.S. 465 (1946); Feistman v. Commissioner, 63 T.C. 129, 134 (1974); secs. 1.162-2(e), 1.262-1(b)(5), Income Tax Regs.

Mr. Beck and Michael used the corporate-owned automobiles to commute to work and for personal purposes. Petitioners did not keep logs for any business use of the vehicles, and the record does not show that Beck's Liquors is entitled to a deduction greater than the amount allowed by respondent. Beck's Liquors may not deduct amounts in excess of those allowed by respondent.

### 3. Annual Meeting Expenses

Every summer, the Becks spent 1 or 2 weeks in a cabin at a resort on Lake Melissa in Detroit Lakes, Minnesota. Michelle and her three children stayed a week, and Michael stayed a couple days. The corporate minute book reflects that the annual stockholders meeting was held at the lake, and Beck's Liquors paid the expenses incurred by the Becks for the vacation.

Although an informal annual stockholders meeting may have been held during the week at the cabin, the trip was, in fact, a

vacation, primarily for the recreation and pleasure of the family.  The expenses are not deductible.

### 4.  Travel Expenses and Entertainment Expenses

#### a.  Las Vegas Expenses

Beck's Liquors deducted travel expenses Mr. Beck incurred traveling to Las Vegas, and expenses incurred for the yearly trip to the cabin.  Under section 162(a)(2), a taxpayer is allowed to deduct ordinary and necessary travel expenses paid while away from home in the pursuit of business.  Commissioner v. Flowers, supra at 470; Walliser v. Commissioner, 72 T.C. 433, 437 (1979).  Where a taxpayer travels to a destination for both business and personal activities, travel expenses to and from the destination are deductible only if the trip is related primarily to the taxpayer's business.  If the purpose of the trip is primarily personal, the travel expenses to and from the destination are not deductible even though the taxpayer engages in some business activities at the destination.  Duncan v. Commissioner, 30 T.C. 386, 390-391 (1958); sec. 1.162-2(b)(1), Income Tax Regs.  Whether a trip is related primarily to the taxpayer's business or is primarily personal is a question of fact.  Commissioner v. Flowers, supra; sec. 1.162-2(b)(1), Income Tax Regs.  A casual connection to one's business does not make the cost of the trip a business expense.  Ballantine v. Commissioner, 46 T.C. 272, 279-280 (1966).

Mr. Beck justified payment by Beck's Liquors of expenses for traveling to Las Vegas by the savings in the exchange rate. The Fargo banks charged 17 percent whereas the casinos charged 10 percent. If he exchanged $10,000 in Fargo, the banks charged $1,700. If he exchanged the same amount in Las Vegas, the casinos charged only $1,000. Therefore, every time he went to Las Vegas, he saved $700 to $1,050 on the exchange, which amounts exceeded his travel expenses.

Although Mr. Beck was able to get a better exchange rate for the Canadian currency, we are convinced that the trips to Las Vegas were primarily to allow Mr. Beck to gamble. The expenses are personal and not deductible.

### b. Other Meal and Entertainment Expenses

Beck's Liquors claimed the cost of meals as entertainment deductions for 1991, 1992, and 1993, most of which respondent disallowed. Respondent disallowed all deductions for meal expenses.

Entertainment expenses are not deductible from gross income unless, as a threshold matter, they are ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business. Sec. 1.162-1(a), Income Tax Regs. The expenses must be "directly related" to the business. Sec. 274(a); sec. 1.274-2(c)(3), Income Tax Regs. For an entertainment expense to be directly related to the active

conduct of a business, the taxpayer must have had more than a generalized expectation of deriving income or a specific business benefit at some indefinite future time from those entertained. Walliser v. Commissioner, supra at 441. Even if such expenses are business related within the meaning of section 162, however, they must be substantiated pursuant to section 274(d) and the regulations thereunder. Sec. 1.274-1, Income Tax Regs.

Beck's Liquors did not comply with the detailed substantiation requirements of section 274 and the regulations thereunder. Beck's Liquors deducted meal expenses because some topic related to the liquor store was always discussed. Mr. Beck testified that, during the meals, he was entertaining clients or discussing business with an employee or supplier. A taxpayer's general testimony that business was always discussed during the entertainment is not sufficient to establish a business purpose. The fact that there was a general discussion of the liquor store does not establish a business purpose directly related to the business of Beck's Liquors. Rutz v. Commissioner, 66 T.C. 879, 884 (1976); Leon v. Commissioner, T.C. Memo. 1978-367.

c. Cost of Tickets To Various Sporting Events

Beck's Liquors purchased tickets to various sporting events for promotional purposes and deducted the cost as an entertainment expense. Respondent allowed all but $200 of the cost of the tickets as a deductible expense. Respondent did not

allow a deduction for $200 attributable to tickets used by Mr. Beck. The tickets used by Mr. Beck were personal expenses not deductible by the corporation.

    5. Insurance, Condominium Fees, Utilities, and Property Taxes Paid for Residences of Mr. Beck, Michael, and/or Michelle

Generally, a taxpayer may not deduct expenses with respect to a dwelling unit that the taxpayer uses as a residence during a taxable year. Sec. 280A(a). This general rule does not apply, however, where the taxpayer uses a portion of the residence regularly and exclusively as the taxpayer's principal place of business. Sec. 280A(c)(1)(A). Mr. Beck asserts that, because his residence address is the address used by Beck's Liquors for purposes of State licensing and registration, that his residence is the principal place of business of Beck's Liquors.

In Commissioner v. Soliman, 506 U.S. 168, 174 (1993), the Supreme Court held that when a taxpayer carries on business in more than one location the principal place of a taxpayer's business is the most important or significant place of business. This turns on two conditions: (1) The relative importance of the activities performed at each business location, and (2) the time spent at each place. Id. The most important activity of Beck's Liquors is the sale of liquor. The sale take place in the store, not in petitioner's condominium.

Mr. Beck also asserts that he should be allowed to deduct expenses related to garages, because store supplies are stored in the garages. An exception in section 280A(c)(1)(C) provides that if an office is a "separate structure" not attached to the dwelling unit and is used in connection with the taxpayer's trade or business, a home office deduction may be justified. However, the statute requires that the separate structure be used exclusively for business purposes in order to qualify for the deduction. Mr. Beck does not assert that the garages are used exclusively for business purposes. The expenses related to Mr. Beck's condominium and the garages are personal expenses of Mr. Beck and may not be deducted by the corporation.

6. Charges on the Corporate Visa Card for Mr. Beck's Personal Expenses

Mr. Beck used the corporate VISA credit card to pay for his personal expenses in addition to corporate expenses. Mr. Beck claims that he did not deduct his personal expenses on the corporation's return. Mr. Beck did not report the payments as income to him. The expenses are not deductible by the corporation and are taxable dividends to Mr. Beck.

7. Mrs. Beck's Memorials, Funeral, and Medical Expenses

Mr. Beck wrote checks from the corporate account to churches and charitable organizations in memory of Mrs. Beck. Some of Mrs. Beck's funeral expenses were paid from Beck's Liquors

checking account.  These items represent nondeductible personal expenses.

C.  Conclusion

We conclude that respondent has shown that Beck's Liquors and Mr. Beck underpaid taxes in all the years at issue.

II.  Intent To Evade Taxes

The Commissioner must prove by clear and convincing evidence that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, 94 T.C. at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

A corporation is liable for fraud if the corporate officer has the fraudulent intent to evade the corporation's taxes. DiLeo v. Commissioner, 96 T.C. 858, 875 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Federbush v. Commissioner, 34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963); Mazzocchi Bus Co. v. Commissioner, T.C. Memo. 1993-43, affd. 14 F.3d 923 (3d Cir. 1994).  The fraudulent intent of Beck's Liquors may be established by the acts of its president, Mr. Beck, who completely dominated its activity.

Fraud means "actual, intentional wrongdoing", Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), or the intentional commission of an act or acts for

the specific purpose of evading a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.  A taxpayer's negligence, even gross negligence, is not enough to prove a willful attempt to evade tax, Kellett v. Commissioner, 5 T.C. 608, 618 (1945), and understatement of income is not sufficient to establish fraud, Estate of Upshaw v. Commissioner, 416 F.2d 737, 741 (7th Cir. 1969), affg. Upshaw v. Commissioner, T.C. Memo. 1968-123.   However, if a taxpayer consistently underreports income and other circumstances show an intent to conceal the income, an inference of fraud may be justified.  Holland v. United States, 348 U.S. at 137.

A.  Badges of Fraud

The courts have developed a number of objective indicators or "badges" of fraud.  Recklitis v. Commissioner, 91 T.C. 874, 910 (1988).

Fraud may be inferred from "any conduct, the likely effect of which would be to mislead or to conceal."  Spies v. United States, 317 U.S. 492, 499 (1943).  The courts have relied on numerous indicia of fraud including the following: (1) a taxpayer's failure to report income over an extended period of time; (2) a taxpayer's failure to file a tax return; (3) a taxpayer's concealment of bank accounts from internal revenue agents, failure to furnish the Government with access to his records, and failure to cooperate with tax authorities; (4) a

taxpayer's failure to keep adequate books and records; (5) dealing in cash; (6) a taxpayer's experience and knowledge, especially knowledge of tax laws; (7) a taxpayer's implausible explanations of conduct given at trial; and (8) participation in illegal activities or concealment of an illegal activity. Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Bahoric v. Commissioner, 363 F.2d 151, 153-154 (9th Cir. 1966); Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); McCullough v. Commissioner, T.C. Memo. 1993-70. These indicia are not direct evidence of fraud, and we consider them in the context of the surrounding circumstances. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992); Comparato v. Commissioner, T.C. Memo. 1993-52.

    1. Failure To Report Income Over an Extended Period of Time

Mr. Beck underreported the income of Beck's Liquors in each of the years at issue. The greatest portion of the omitted income is attributable to the inclusion of cash purchases and disallowance of deductions for payment of personal expenses of Mr. Beck and his children. Mr. Beck also failed to report as income the amount of his personal expenses that were paid out of the corporation's funds. Fraud, however, may not be inferred from a mere understatement of income, Holland v. United States, 348 U.S. at 139, or from a deficiency in tax due to an honest

mistake or poor judgment, Iley v. Commissioner, 19 T.C. 631 (1952). Although these omissions are substantial enough to indicate fraudulent intent, the omissions alone are not so substantial as to unequivocally indicate fraudulent intent, and we consider them in the context of the entire record. Candela v. United States, 635 F.2d 1272, 1274 (1980); Recklitis v. Commissioner, supra at 909; Wheadon v. Commissioner, T.C. Memo. 1992-633; cf. Kramer v. Commissioner, 389 F.2d 236 (7th Cir. 1968), affg. T.C. Memo. 1966-234.

Mr. Beck believed that payment by the corporation of an expense tied to the corporation was proper. For example, the corporation paid for the expenses incurred at the cabin and deducted them as expenses related to the annual stockholders' meeting. The corporation owned the condominiums where Mr. Beck and Michael resided. The corporation paid expenses related to the condominiums and deducted the expenses on its return. Similarly, expenses for the vehicles used by Mr. Beck and Michael were deducted.

The corporation paid for many of Mr. Beck's meals. Mr. Beck believed that the payment and deduction was proper because he discussed the activities of the liquor store or was entertaining customers or suppliers of the store.

The corporation paid for Mr. Beck's travel expenses to Las Vegas. The corporation's savings at the better exchange rate in

Las Vegas exceeded the costs of Mr. Beck's travel expenses. Therefore, he reasoned that it was proper for the corporation to pay for the expenses and deduct the expenses on its returns.

Although Mr. Beck was wrong about the propriety of paying those expenses with corporate funds and deducting the expenses on the corporate return, we do not think that the error was a result of fraudulent intent to evade tax.

Furthermore, Beck's Liquors underreported its cost of goods sold by $39,004 on its 1992 return. A taxpayer intending to fraudulently evade tax would not understate the cost of goods sold, particularly by such a substantial amount.

### 2. Failure To File a Tax Return

In the instant cases, Mr. Beck's failure to file returns for 1992 and 1993 is consistent with his belief that his gross income was less than the minimum amount that required the filing of a return. Mr. Beck's failure to file does not, therefore, convince us that such failure was due to fraud. Dajos v. Commissioner, T.C. Memo. 1986-330.

### 3. Concealment of Bank Accounts From Internal Revenue Agent, Failure To Furnish the Government With Access To His Records, and Failure To Cooperate With Tax Authorities

There is no evidence of concealment or attempts to mislead respondent's agents. Mr. Beck was cooperative and forthright throughout respondent's investigation. There is no evidence of any falsification or alteration of books and records. Mr. Beck

did not conceal his assets or the assets of Beck's Liquors. Mr. Beck did not use secret accounts or fictitious nominees to hide his sources of income. Mr. Beck turned over to respondent all records that he was aware of at the relevant times and thought were pertinent to the tax returns.

### 4. Failure To Keep Adequate Books and Records

Mr. Beck's failure to keep adequate books and records resulted in large part from his failure to seek professional bookkeeping and tax advice, his lack of bookkeeping training, and the unusual and tragic circumstances surrounding Mrs. Beck's death. Mrs. Beck was killed in a car accident in July 1991. As Mr. Beck explains:

> The years 1991-93 were years of trama [sic]. My wife and I were in an auto accident in which we struck a moose on the interstate. The top of our car was taken off. My wife was driving and was decapated [sic]. Unless someone has seen your wife and best friend of 38 years bleed to death and die in front of your eyes, I don't think that you could be thinking about keeping a great set of books. She had done the bookkeeping up to that time. * * *

On the entire record, petitioners' books and records are not inadequate as a result of fraud.

### 5. Dealing in Cash

Although Mr. Beck may have conducted many transactions in cash, there is no indication that he tried to hide or conceal any of these activities. His property purchases and banking activities were appropriately documented. There is no evidence

that Mr. Beck attempted to structure cash purchases to avoid the requirements for reporting cash transactions.

6.  Taxpayer's Experience and Knowledge, Especially Knowledge of Tax Laws

In determining the presence or absence of fraud, we "must consider the native equipment and the training and experience of the party charged." Iley v. Commissioner, 19 T.C. at 635. Mr. Beck did not consult an accountant or any other professional for advice in preparing the returns of Beck's Liquors or his individual returns. He has no special training or education.

7.  Taxpayer's Implausible Explanations of Conduct Given at Trial

Mr. Beck's testimony was plausible and, we believe, generally truthful. At the trial of this case, he answered questions directly and candidly and did not appear to be evasive or deceptive. He impressed us as a sincere, although mistaken, individual. We may discount testimony which we find to be unworthy of belief, but we may not arbitrarily disregard testimony that is credible and uncontradicted, Conti v. Commissioner, 39 F.3d 658, 664 (6th Cir. 1994), affg. and remanding 99 T.C. 370 (1992), and T.C. Memo. 1992-616.

8.  Participation in Illegal Activities or Concealment of an Illegal Activity

Respondent does not allege that Mr. Beck participated in any illegal activities or that he tried to conceal an illegal activity.

B.  Conclusion

The existence of fraud is a question of fact to be resolved by consideration of the entire record.  Parks v. Commissioner, 94 T.C. at 660; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). We do not impute or presume fraud, and we do not find fraud on the basis of circumstances that do no more than create a suspicion of fraud.  Green v. Commissioner, 66 T.C. 538, 550 (1976).  Although respondent is not required to establish fraud beyond a reasonable doubt, the "clear and convincing" standard requires that he establish fraud by more than a preponderance of the evidence.  Kellett v. Commissioner, 5 T.C. at 616.

Although Mr. Beck's omissions of income were substantial, alone they do not provide clear and convincing evidence that he intended to evade tax.  The other indicia of fraud that we have considered are inconclusive or show a lack of fraudulent intent. Mr. Beck's explanations for his failures to report all income were neither implausible nor inconsistent, and the circumstances surrounding the omissions are as consistent with innocent mistake as with willful evasion.

What has been proved is a negligent or, at most, a willful disregard of rules or regulations.  After examining the record, we conclude that Mr. Beck lacked the specific intent to evade tax that is required to find fraud.

In the absence of fraud, the period for assessing a deficiency in tax had expired prior to the issuance of the notices of deficiencies to Beck's Liquors for all years at issue and to Mr. Beck for 1991. Sec. 6501(c)(2).

Issue 4. Whether Petitioner Mr. Beck Received Constructive Dividends From Beck's Liquors in 1992 and 1993 in the Respective Amounts of $151,448 and $117,641

Because Mr. Beck did not file returns for 1992 and 1993, the period for assessing a deficiency did not expire prior to the issuance of the notice of deficiency. Sec. 6501(c)(3). Respondent asserts that Mr. Beck is the true owner of the stock of Beck's Liquors and that he received constructive dividends from the corporation in 1992 and 1993.

I. Ownership of Stock of Beck's Liquors

Beneficial ownership rather than bare legal title is critical in determining who is a shareholder. Hook v. Commissioner, 58 T.C. 267, 273 (1972); Hoffman v. Commissioner, 47 T.C. 218, 233 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968).

A nominee theory involves the determination of the true beneficial ownership of property. See, e.g., Oxford Capital Corp. v. United States, 211 F.3d 280, 284 (5th Cir. 2000). Nominees, guardians, agents, and custodians are not recognized as taxable entities. W & W Fertilizer Corp. v. United States, 208 Ct. Cl. 443, 527 F.2d 621, 627 (1975).

The following factors are generally considered in determining nominee status: (a) No consideration or inadequate consideration paid by the nominee; (b) property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property; (c) close relationship between transferor and the nominee; (d) failure to record conveyance; (e) retention of possession by the transferor; and (f) continued enjoyment by the transferor of benefits of the transferred property. United States v. Miller Bros. Constr. Co., 505 F.2d 1031 (10th Cir. 1974)); see also Oxford Capital Corp. v. United States, supra.

Mr. Beck testified:  "My son and my daughter owned the stock.  My son said he didn't own the stock.  But this, of course, is a private family affair.  When I am gone, the children are going to own that store without any hassle.  So the stock was transferred to the children back in the '80s."  Further, he testified that Michael "will own the business, half of it, when the time comes."

The record in these cases establishes that, although the stock was originally titled in Mrs. Beck's name, Mr. and Mrs. Beck equally owned and controlled the stock in Beck's Liquors. After Mrs. Beck died, Mr. Beck alone controlled and owned the stock.  Neither Mr. Beck nor Mrs. Beck intended for Michael and Michelle to own the stock during the parents' lifetimes.  We find

that Mr. Beck was the sole shareholder of Beck's Liquors during the years at issue.

## II.  Constructive Dividends

Section 61(a) defines gross income to include "all income from whatever source derived," including receipt of a dividend. Sec. 61(a)(7).  A dividend is "any distribution of property made by a corporation to its shareholders" to the extent of its earnings and profits.[7]  Sec. 316(a).  "When a corporation confers an economic benefit upon a shareholder, in his capacity as such, without an expectation of reimbursement, that economic benefit becomes a constructive dividend, taxable to the respective shareholder."  Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); see also Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980).

Respondent determined that the following payments by Beck's Liquors were constructive dividends to Mr. Beck:

|  | 1992 | 1993 |
| --- | --- | --- |
| Diverted corporate income | $115,133 | $84,782 |
| Condo association fees | 1,014 | 980 |
| Insurance-condos, vehicles | 1,866 | 1,830 |
| Credit card--personal expenses | 14,993 | 16,193 |
| Auto expense/repairs | 7,294 | 4,679 |
| Miscellaneous | 378 | 254 |
| Advertising/personal ticket use | 200 | 200 |

---

[7]Neither party argued that Beck's Liquors had insufficient earnings and profits for the distributions to be treated as dividends.

| | | |
|---|---:|---:|
| Condo utilities | 1,398 | 1,580 |
| Other personal expenses | 5,239 | 2,221 |
| Property taxes | 1,750 | 3,296 |
| Annual meeting expense | 2,183 | 1,626 |
| Total | 151,448 | 117,641 |

A.  Diverted Corporate Income

The diverted corporate income is the gross receipts omitted from the corporate returns for each year determined as follows:

| | 1992 | 1993 |
|---|---:|---:|
| State Bank deposits | $1,475,700 | $1,554,350 |
| Cash payments | 101,305 | 75,487 |
| Nonincome items | (335,616) | (391,143) |
| Total gross receipts | 1,241,389 | 1,238,694 |
| Reported on return | 1,126,256 | 1,153,912 |
| Unreported gross receipts | 115,133 | 84,782 |

The State Bank deposit amounts were the amounts deposited into the corporation's State Bank account.  There is no evidence that those amounts were distributed to Mr. Beck or to either of his children.  We hold that those amounts are not constructive dividends to Mr. Beck.

The cash payments include the following:

| Cash payments | 1992 | 1993 |
|---|---:|---:|
| Cash expenses--till | $3,632 | $1,709 |
| Wage--till | 18,002 | 2,382 |
| Gambling losses | 15,700 | -- |
| Norwest Bank | 2,316 | 4,026 |
| Loan payments | 35,000 | 44,000 |
| Purchase of ring | 10,655 | -- |
| Purchase of car | 9,400 | -- |
| Merrill Lynch | 6,600 | -- |
| Deposit subsequent year | -- | 23,370 |
| Total cash payments | 101,305 | 75,487 |

The amount of cash that was not reported by the corporation that is attributable to cash taken from the till to cash employee checks and to pay for expenses was not cash distributed to Mr. Beck and is not a constructive dividend to him.

Mr. Beck did not have gambling losses during the years at issue. Rather, he had gambling winnings of $8,300 in 1992 and $12,000 in 1993. Mr. Beck did not report the gambling winnings as income. Although the winnings are not constructive dividends, they are income to Mr. Beck that is to be included in his income for the years at issue. We have found that the cash winnings represent a source of cash, and the cash payments should be reduced by $8,300 in 1992 and $12,000 in 1993.

The $6,600 was deposited into the corporation's Merrill Lynch account in 1992; Mr. Beck did not receive the money, and it is not a constructive dividend to him. Similarly, the Norwest account is the corporation's account, and the cash deposited into that account is not a constructive dividend to Mr. Beck. The $23,370 received at the end of 1993 and deposited into the State Bank account in January 1994 also is not a constructive dividend to Mr. Beck.

Mr. Beck asserts that the $10,655 paid in 1992 for the ring was a cash loan to him, that the $9,400 paid in 1992 for the car was a cash loan to Michael, and that the loan payments of $35,000 in 1992 and $44,000 in 1993 were cash loans to Michelle. Mr.

Beck has failed to prove that it is more likely than not that these items were loans. There are no loan documents, and there is no evidence that Mr. Beck, Michael, or Michelle ever intended to repay the corporation for the payments. Those amounts are dividends to Mr. Beck.

B. Remaining Expenses

Respondent asserts that the remaining items are personal expenses of Mr. Beck that were paid for by the corporation.

Corporate shareholders who use corporate property for personal purposes or for whom the corporation pays personal expenses are charged with additional distributions from the corporation, taxable to them as constructive dividends to the extent of the corporation's earnings and profits. Melvin v. Commissioner, 88 T.C. 63, 79 (1987), affd. per curiam 894 F.2d 1072 (9th Cir. 1990); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962). When a corporation has made such a transfer to a member of the shareholder's family, the shareholder has enjoyed the use of such property no less than if it had been distributed to him directly. Byers v. Commissioner, 199 F.2d 273 (8th Cir. 1952), affg. a Memorandum Opinion of this Court.

If a corporation provides property for or pays personal expenses of employees in their capacity as such, the employees are charged with additional income in the form of constructive

wages or salary.  Sec. 61(a)(1).  Whether personal use of corporate property constitutes constructive dividends or constructive wages is a question of fact.  Loftin & Woodard, Inc. v. United States, 557 F.2d at 1242; Goldstein v. Commissioner, 298 F.2d 562, 566 (9th Cir. 1962), affg. T.C. Memo. 1960-276.

Whether amounts are paid as compensation turns on the factual determination of whether the payor intends at the time that the payment is made to compensate the recipient for services performed.  See Whitcomb v. Commissioner, 733 F.2d 191, 194 (1st Cir. 1984), affg. 81 T.C. 505 (1983); Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 92 (2000); King's Ct. Mobile Home Park, Inc. v. Commissioner, 98 T.C. at 514-515; Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973).

In lieu of wages, Beck's Liquors paid the real estate taxes on the condominium in which Michael resided, the insurance on the Topaz, and the premium on Michael's life insurance policy.  For the occasional work Michelle performed for the store, Beck's Liquors paid for the insurance on the Buick she drove.  Those payments are not constructive dividends to Mr. Beck.

With respect to the remaining items, they are personal expenses of Mr. Beck that were paid for by the corporation; they are dividends taxable to Mr. Beck in the year of payment.

To reflect the foregoing,

<u>Decisions will be entered for petitioners in docket Nos. 12215-99 and 12217-99</u>.

<u>Decision will be entered under Rule 155 in docket No. 12216-99</u>.